FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN JAMES MCFARLAND,
          *Plaintiff-Appellant,*

v.

GALE A. NORTON, in her capacity
as Secretary of the Department of
the Interior; JOHN F. SHIREMAN, in
his capacity as Acting
Superintendent of Glacier National
Park; UNITED STATES OF AMERICA;
NATIONAL PARK SERVICE,
          *Defendants-Appellees,*

NATIONAL PARKS CONSERVATION
ASSOCIATION,
     *Defendant-Intervenor-Appellee.*

No. 03-35831

D.C. No.
CV-00-00020-DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted
February 10, 2005—Seattle, Washington

Filed October 11, 2005

Before: Monroe G. McKay,* Diarmuid F. O'Scannlain, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge O'Scannlain

*The Honorable Monroe G. McKay, Senior United States Circuit Judge
for the Tenth Circuit, sitting by designation.

13965

## COUNSEL

Alison Roberts, Lakewood, Colorado, argued the cause for the appellant; Kelly S. Hall and William Perry Pendley, Mountain States Legal Foundation, Lakewood, Colorado, were on the briefs.

Todd S. Kim, Washington, D.C., argued the cause for the appellees; Kelly A. Johnson, Acting Assistant Attorney General, William W. Mercer, United States Attorney, Kris A. McLean, James C. Kilbourne, and Todd S. Kim, United States Department of Justice, Washington, D.C., and Gary Moore, United States Department of the Interior, Washington, D.C., were on the brief for the federal appellees. Alan J. Pemberton, Vijay Shanker, and Emily S. Williams, Washington, D.C., were on the brief for appellee National Parks Conservation Association.

## OPINION

O'SCANNLAIN, Circuit Judge:

We are asked to decide whether a landowner can prove that he has an easement over a federally-owned road to his property within Glacier National Park in Montana and whether the National Park Service arbitrarily and capriciously denied his request for a special use permit to use the road during the winter time.

I

In 1916, Charles F.W. Schoenberger received title under the Homestead Act to an 89-acre parcel in Montana. The parcel was within the boundaries of the Glacier National Park and was used as a year-round subsistence homestead. In 1984, John James McFarland purchased a 2.75-acre portion of Schoenberger's land. McFarland's portion, and, indeed, the entirety of the original Schoenberger homestead, is accessible via a road, in existence since 1901, known within Glacier National Park as the North Fork Road, the Inner North Fork Road, or Glacier Route 7. The National Park Service owns and maintains Glacier Route 7, a portion of which, beginning at the Polebridge Ranger Station and running north 3 miles, provides the only vehicular access to the original Schoenberger homestead, including McFarland's portion of it. Another possible means of access is across the North Fork of the Flathead River, which borders one side of McFarland's property and is the Park boundary. A county road runs along the other bank of the North Fork, outside the park boundaries.

McFarland's grandparents and others lived year-round on Schoenberger homestead parcels into the 1960s. The Park Service snow-plowed Glacier Route 7 past the Polebridge Ranger Station until the 1950s.[1] For a time thereafter, year-

---

[1]The Polebridge Ranger Station is in operation year round and the road up to that point is plowed.

round residents on the Schoenberger homestead cooperated to plow the road themselves.

In 1975, the Park Service banned snowmobiling within Glacier National Park, including along Glacier Route 7. For some time the Park Service has closed Glacier Route 7 to winter public vehicular access, having published such policy in official documents since 1987 and announced it to local media since 1988. At some point in the 1970s, the Park Service began to put up wooden barriers at the Polebridge Ranger Station, though land owners were allowed to move them aside for access. In 1976, the Park Service replaced the wooden barriers with a locked cable strung across the road but would unlock the cable at the request of property owners so that they could access their property in the winter. Later a double lock system was installed, in which landowners had access to the road when it was passable after it was closed to the public.

In the fall of 1999, McFarland informed the Park Service that he and his wife and three daughters intended to live at their home on the Schoenberger homestead year-round. On December 8, 1999, the Park Service informed McFarland that "a policy decision has been made that no one will drive park roads once they are closed to the public." The Park Service went on to say that "[o]nce we close the gate at Polebridge for the winter, it will remain closed until the road is safely passable to the public again." The Park Service concurrently changed the lock system, denying access.

On January 6, 2000, McFarland filed a special use permit application with the Park Service for motorized access to his home on Glacier Route 7. In that application, McFarland explicitly claimed that he owned an easement and requested permission to "unlock the gate [at the Polebridge Ranger Station] and gain access to [his] property at any time without further assistance from Park Service personnel." As a fallback position, or in "the event the road conditions make it unsafe or unpractical to drive," McFarland sought the right to use a

snowmobile between his home and the Polebridge Ranger Station. McFarland sought the same rights of access for guests.

On January 24, 2000, the Park Service denied McFarland's application. McFarland and his family then moved from their Glacier National Park residence because, he testified, they were left with no reasonable means of access. On March 14, 2000, McFarland appealed within the agency. On April 21, 2000, the Park Service denied his administrative appeal.

In due course, McFarland filed suit (1) to quiet title to an easement over Glacier Route 7 under the Quiet Title Act and, (2) to seek judicial review, pursuant to the Administrative Procedure Act ("APA"), of the decision by the Park Service denying him a special use permit.

McFarland and the government each moved for summary judgment and the government also moved to dismiss, which latter motion the district court granted. The district court found that the landowners generally had access to their property until 1999 and that McFarland had personally never been denied access until that year. The district court nonetheless held that McFarland's action to quiet title ran afoul of the statute of limitations, since his action accrued in 1976 when property holders had to start requesting the Park Service to open the gate during the winter. The district court rejected the APA claim on the ground that it was just an attempt to quiet title by another means. The district court denied McFarland's and the Park Service's summary judgment motions as moot. McFarland timely appeals.

II

**[1]** McFarland filed suit on February 2, 2000, under the Quiet Title Act, 28 U.S.C. § 2409a, which contains a 12-year statute of limitations. 28 U.S.C. § 2409a(g). Therefore, McFarland's attempts to quiet title, either through the Quiet

Title Act or through the APA, would be rightly dismissed if he knew or should have known of the United States' adverse claim by February 2, 1988.

**[2]** If McFarland were asserting fee title to Glacier Route 7, "notice of a government claim that create[d] even a cloud on that title may be sufficient to trigger the limitations period." *Michel v. United States*, 65 F.3d 130, 132 (9th Cir. 1995) (citing *California v. Yuba Goldfields*, 752 F.2d 393, 394-97 (9th Cir. 1985)). An easement, of course, is different. The government's claim to ownership and control of the servient tenement can be entirely consistent with private ownership of an easement. *Id.* Because McFarland claims title to an easement, his action accrued only when he or his predecessors-in-interest "knew or should have known the government claimed the exclusive right to deny their historic access" to Glacier Route 7. *Id.*

**[3]** The government, in its capacity as the owner of the servient tenement, has the right to reasonable use of its land, and its rights and the rights of easement owners are "mutually limiting," though of course "easements are burdensome by their very nature, and the fact that a given use imposes a hardship upon the servient owner does not, in itself, render that use unreasonable or unnecessary." *Tooker v. Feinstein*, 886 P.2d 1051, 1053 (Or. Ct. App. 1994); *see also* Restatement (Third) of Property (Servitudes) § 4.9 (2000). It follows that mild interference with the use of an easement pursuant to the government's own property interests will not start the statute of limitations running.

The situation is more complicated where, as here, the landowner could reasonably presume that the federal entity concerned has the power to regulate. *See, e.g.,* 16 U.S.C. § 3 ("The Secretary of the Interior shall make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks . . . ."); *Lesoeur v. United States*, 21 F.3d 965, 968 (9th Cir. 1994) (acknowledg-

ing that Congress has given the Secretary "a great deal of discretion in promulgating and enforcing regulations for use of the national parks."). This can make it difficult to distinguish reasonable regulations that happen to restrict use of the easement from actions taken incident to the government's claim of exclusive ownership. To avoid forcing landowners and the government into "premature, and often unnecessary, suits," *Michel*, 65 F.3d at 132, we should not lightly assume that regulatory or supervisory actions, as opposed to those that deny the easement's existence, will trigger the statute of limitations. Were it not so, any regulation of a property interest would challenge ownership of the interest itself.

[4] We are satisfied that the 1975 general ban on snowmobile use within the boundaries of Glacier National Park² did not constitute notice to McFarland that the Park Service claimed exclusive ownership over Glacier Route 7. It is true that McFarland knew or should have known about it, since the record shows that the ban was a topic of conversation among landowners. Nevertheless, the snowmobile ban was a generally applicable regulation which did not affect plowing of Glacier Route 7, the historic means of facilitating winter access.

[5] Nor did the installation of barriers, cables with locks in 1976, and later gates with locks, give notice to McFarland that the Park Service claimed exclusive ownership over the road. Ordinarily the owner of the land over which an easement runs has the right to erect gates across the easement if they do not interfere unreasonably with the easement owner's right of passage. *See, e.g., United States v. Johnson*, 4 F. Supp. 77, 79 (W.D. Wash. 1933) (holding that "gates at termini" do not preclude the "free, full, and quiet enjoyment" of an easement). This is especially true where the gate ensures that only those with a right to use an easement can access it. *See id.*; *Lovitt*

---

²We assume, as seems likely, that McFarland knew or should have known of the ban before February 2, 1988.

*v. Robideaux*, 78 P.3d 389, 395-96 (Idaho 2003). Unless the installation of gates is coupled with a denial of access, there is no easement infringement.

No landowner was denied access through the gates and barriers when the road was passable until well after February 2, 1988. Nor, prior to that date, was a landowner refused permission to plow the road or to drive it down.[3] McFarland states that he always had access whenever he wanted it up until 1999, with the exception of an incident in which another landowner, Paul Snyder, found that the second lock was locked while the road was still passable, after which a key to it was also provided. Scott Emmerich, an official for the Park Service, testified that landowners were allowed access while the road was passable. Another Park Service official has also asserted that, for at least a period in the 1990s, the Park Service allowed private landowners to drive the road after it was closed to the public "until the snow became too deep."

[6] There are no instances in the record until 1999 of Park Service refusal to unlock the gates when landowners asked. Emmerich insists that he would not have unlocked the gate after the road became impassable but admits that no one ever asked. Even if some landowners were denied access, it does not follow that McFarland knew or should have known. McFarland's own testimony is that he was given access every time he asked and that the latest he sought access was "through New Year's" and the earliest was "in April." McFarland testified that he understood his neighbors to have been given the same degree of access. And even assuming that McFarland knew or should have known about these instances, they would not necessarily have been sufficient to begin the statute of limitations. Barring access to impassable roads—as opposed to denying permission to make the roads passable

---

[3]A procedure described in the record, in which a truck or other vehicle is repeatedly driven up and down the road after a snow, packing the snow down and keeping the road somewhat passable.

through plowing or driving down—is well within the government's concern for safety in the use of the easement and need not be construed as a denial of the easement.

[7] Because McFarland was not denied year-round access when he desired it until 1999, he did not know nor should he have known that the government disputed his claim to an easement. The statute of limitations did not run and McFarland is entitled to pursue his Quiet Title Act claims in district court on remand.[4]

## III

[8] In his Quiet Title Act action, McFarland offers three different theories under which he owns an easement of access. First, he argues that his predecessors-in-interest were expressly granted an easement, because land patents issued under the Homestead Act conveyed the land "with the appurtenances thereof," citing *Hunter v. United States*, 388 F.2d 148, 154 (9th Cir. 1967) (explaining that "an appurtenance . . . is that which is essential to the use of the right granted"). Second, he argues that his predecessors-in-interest were granted an easement by implication, since easements of access would generally be necessary to fulfill the Homestead Act's purposes of encouraging the settlement of the vast frontier. Finally, he argues that he has an easement under the doctrine of easement by necessity. The district court did not rule on the merits of these claims. Since the factual basis of these claims is incomplete in the record, summary judgment at this stage would be inappropriate. *See Jones-Hamilton Co. v. Beazer Materials & Services, Inc.*, 973 F.2d 688, 694 n.2 (9th Cir. 1992) ("[W]e may review a denial of summary judgment . . . *where the record has been sufficiently developed to support*

---

[4]Nor should the district court have dismissed McFarland's claims under the APA on the grounds that they were an end run around the statute of limitations. McFarland is also entitled to pursue his APA claims on remand.

*meaningful review of the denied motion*." (emphasis added)). McFarland is entitled to pursue all these claims on remand.

## IV

McFarland brought his action to quiet title well within the 12-year statute of limitations. The dismissal of his claim is reversed and this case is remanded to the district court for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**