FILED
United States Court of Appeals
Tenth Circuit

**March 5, 2012**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ANNE GEORGE,

            Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA;
UNITED STATES FOREST
SERVICE; THOMAS VILSACK,
Secretary of Agriculture; THOMAS
TIDWELL, Chief of the U.S. Forest
Service; CORBIN NEWMAN,*
Regional Forester, Intermountain
Region; KELLY M. RUSSELL, Forest
Supervisor, Gila National Forest;
RUSSELL WARD, District Ranger,
Silver City Ranger District, Gila
National Forest,

            Defendants - Appellees.

No. 11-2045

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 09-CV-00851-LFG-RHS)**

James M. Manley (Steven J. Lechner with him on the briefs), Mountain States
Legal Foundation, Lakewood, Colorado, for Plaintiff-Appellant.

---

    * Corbin Newman is substituted for Harv Forsgren as the current Regional
Forester, Intermountain Region, pursuant to Fed. R. App. P. 43(c)(2).

Robert P. Stockman (Ignacia S. Moreno, Manuel Lucero and Aaron P. Avila, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., and Cassandra Casaus Currie, Steve Hattenbach and Andrew R. Varcoe, Office of the General Counsel, United States Department of Agriculture, Washington, D.C., with him on the brief), for Defendants-Appellees.

---

Before **MURPHY, HOLLOWAY,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

Anne George wants to fence her property and, with it, corral her horse. Trouble is, the Forest Service has a road running through her land that Ms. George's fence threatens to block. Ms. George offered to leave a gate across the road unlocked, but the Service rejected this option, arguing that the public needs unfettered access to the adjacent Gila National Forest. Instead, the Forest Service encouraged Ms. George to pen her horse with a fence running alongside its road, but she found this alternative just as unsatisfactory. The parties' wrangling dragged on for years but led nowhere until Ms. George filed this lawsuit. In the end, however, we must rule against her. Whatever legal entitlement she might have had to build a fence across the Forest Service's road she lost years ago thanks to an even less permeable barrier to entry: the statute of limitations.

Where did this dispute get its start and how did it wend its way to federal court? The answer begins with the Gila National Forest, just outside Silver City, New Mexico. First set aside by presidential decree in 1899, the Forest is a place

of soaring peaks and rugged canyons, covering over 3 million acres and embracing what may be the first formally designated wilderness area in the country. Our dispute takes place just outside the Forest's boundaries and traces its own roots back to 1979. It was then when the Forest Service decided to consolidate its holdings and settle (another) land dispute with a certain John S. Hamilton. As part of the deal, Mr. Hamilton agreed to give the government various other lands he owned in return for 1,000 acres next to the Forest. But with Mr. Hamilton's new property came a hitch. The government reserved an easement across the land for its existing Forest Development Road ("FDR") 6819, also known as Shrine Mine Road. The road was and had long been used by the public and Forest Service to enter and exit Gila. Preexisting Forest Service regulations prohibited fencing or otherwise obstructing Forest Service lands, roads, or trails, and at the time of the conveyance FDR 6819 was indeed fence-free.

The real trouble began over a quarter century later, in 2005, when Mr. Hamilton's lot passed (through various owners) to Ms. George. Soon Ms. George set about the business of building a fence around her property, one that crossed the Forest Service's road. The Service objected, removed the fence, and issued a citation. Undeterred, Ms. George rebuilt her fence only to have the process repeat itself — three times in all. As these things go, the dispute became increasingly testy with time. The parties exchanged letters. Ms. George erected "no

trespassing" signs. The Service sent investigators. Photos were taken, evidence was amassed, neighbors were involved. Eventually, Ms. George filed suit in 2009 under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a *et seq.*, a provision that waives the United States's sovereign immunity and permits claims, like this one, seeking "to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a). At summary judgment the district court dismissed Ms. George's suit as time-barred — and it was right to do so.

The problem is that what the QTA gives it often proceeds to take away. While the QTA waives the government's immunity and affords plaintiffs a relatively generous twelve years to bring suit, the trigger for starting that twelve-year clock running is an exceedingly light one. The QTA's limitations period begins running as soon as "the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(g). So the clock in our case started not just when Ms. George first knew about the government's claim to an unobstructed easement. Or even when anyone who owned the land before her knew. The clock started running when she or her predecessors *objectively* should have known about the government's claim to a fence-free road. *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 599 F.3d 1165, 1176 (10th Cir. 2010); *Rosette Inc. v. United States*, 141 F.3d 1394, 1397 (10th Cir. 1998); *Knapp v. United States*, 636 F.2d 279, 283 (10th Cir. 1980).

It is this last feature of the QTA clock that poses the real problem for Ms. George. A problem because, just as the district court held, Ms. George's predecessor in interest, Mr. Hamilton, objectively should have known of the government's claim of right to a fence-free road as early as 1979, about thirty years before she brought suit in 2009. And this means Ms. George has come to court some 18 years too late to do anything about her problem.

Why this is so has much to do with the Federal Register. Congress has instructed that (subject to exceptions not relevant here) publishing a regulation in the Federal Register must be considered "sufficient to give notice of [its] contents" to "a person subject to or affected by it." 44 U.S.C. § 1507; *see also Diamond Ring Ranch, Inc. v. Morton*, 531 F.2d 1397, 1405 (10th Cir. 1976); *Bank of Commerce v. Bd. of Governors of Fed. Reserve Sys.*, 513 F.2d 164, 167 (10th Cir. 1975). So laying 44 U.S.C. § 1507's publication rule beside the QTA's limitations provision in 28 U.S.C. § 2409a(g) tells us this much: the QTA's limitations clock starts running as soon as the federal government publishes a property claim in the Federal Register and a QTA plaintiff or her predecessor in interest is "subject to or affected by" it. A tough rule to be sure, but unavoidable under the two statutes' plain terms. Neither is it an altogether surprising rule given that in our constitutional order Congress has (for better or worse) much discretion to decide when and under what conditions to waive sovereign immunity and allow individuals to tap the public fisc. As the well worn saying goes, the

fact that people "'must turn square corners when they deal with the Government,'
does not reflect a callous outlook.  It merely expresses the duty of all courts to
observe the conditions defined by Congress for charging the public treasury."
*Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947) (quoting *Rock
Island, Arkansas & Louisiana R. Co. v. United States*, 254 U.S. 141, 143 (1920)).
And whether callous or not, no one before us seeks to suggest that Congress
exceeded its considerable constitutional powers when it circumscribed the waiver
of sovereign immunity at issue in this case.

The interaction between the Federal Register and QTA matters in this case
because of regulations the Secretary of Agriculture published in 1977.  Those
regulations prohibited anyone from "placing . . . [a] fence . . . without a permit"
anywhere in the "National Forest System" or on its "[f]orest development road[s]
or trail[s]."  36 C.F.R. §§ 261.10(a); 261.l(a) (1977); *see also* 261.12(e) (1977).
Under 44 U.S.C. § 1507 and 28 U.S.C. § 2409a(g), anyone "subject to or affected
by" this claim of right was legally charged with notice of it sufficient to start the
QTA clock running.  To be "subject to or affected by" a regulation, of course, one
must be prone, disposed, exposed,  liable, or influenced by it.  *Auer v. Robbins*,
519 U.S. 452, 461 (1997) (surveying definitions of "subject to"); 17 Oxford
English Dictionary 30 (2d ed. 1989) (defining "subject" as "exposed or open *to*;
prone *to* or liable to suffer from something damaging, deleterious, or
disadvantageous"); 1 Oxford English Dictionary 212 (defining "affected" as

-6-

"moved on, influenced, acted upon either physically or materially"). But there can be no question that, at least by the time Mr. Hamilton engaged in the land swap in 1979, he was all of those things when it came to the Forest Service's 1977 regulations. It is undisputed that Mr. Hamilton knew in 1979 he was receiving land from the Forest Service. It is undisputed that he knew the Forest Service retained an existing and unobstructed road across his newly acquired property. And it is undisputed that the government's road was and is a Forest Development Road owned by the Forest Service. It follows from all this that Mr. Hamilton became "subject to or affected by" the 1977 regulations claiming entitlement to fence-free property and roads — and thus legally charged with notice of the property claims made in those regulations — from the moment he swapped land with the government. The QTA clock thus began ticking by 1979 because Mr. Hamilton objectively should have known at least by then of the Forest Service's property claim that Ms. George seeks to contest in this case.

Ms. George responds that the Forest Service should not be permitted to use federal regulations to dictate the scope of an easement granted by private contract. Reply Br. at 2-9. She stresses that the Forest Service's 1977 regulations make no appearance either in the 1979 deed between Mr. Hamilton and the government or in the government's easement. And, she argues, both documents were recorded with the State of New Mexico and are thus presumably subject to interpretation under the terms of that State's laws. At the very least,

she insists, there's a triable question of fact regarding whether the 1977 regulations dictate the scope of the Forest Service's easement. *Id.*

All these layered responses, however, suffer from a common underlying problem: they confuse the merits with the time for litigating them. We in no way endorse the government's view that its regulations override the scope of the parties' contractual exchange or the background principles of state property and contract law. If we reached the merits, it might well be that the Service's anti-fencing regulations would have to yield to Ms. George's state law rights as a servient estate owner, allowing her to erect unlocked fences across all rights-of-way running through her land. Our holding today has nothing to do with merits questions like these.

Instead and only it has to do with the statute of limitations. Under the plain terms of the QTA, the statute begins running whenever a plaintiff or her predecessor in interest knew or should have known of the government's "*claim*," a term we have held means an assertion of "some interest adverse to the plaintiff's." *Knapp*, 636 F.2d at 283; *see also* 3 Oxford English Dictionary 261 (defining "claim" as a "demand for something" or "an assertion of right to something"). The merits of that claim or assertion of adverse interest are irrelevant. One can be on *notice* of a claim even if that claim lacks any legal *merit*. Where the rule otherwise, of course, the statute of limitations and merits inquiries would collapse and involve no analytically distinct work. *Spirit Lake*

*Tribe v. North Dakota*, 262 F.3d 732, 738 (8th Cir. 2001); *see also Knapp*, 636 F.2d at 279; *Kingman Reef Atoll Investments, L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008); *Rio Grande Silvery Minnow*, 599 F.3d at 1176-77. Neither does the rule change when notice of a claim comes by way of the Federal Register. One can be "subject to or affected by" a governmental regulation claiming a property interest (and thus legally charged with notice of that regulatory claim) even if the regulation later turns out to be utterly invalid. *See, e.g.*, *Merrill*, 332 U.S. at 386 (noting that "the validity of the regulation" is a separate question from whether someone is subject to or affected by it); *Dunn-McCampbell Royalty Interest, Inc. v. National Park Service*, 112 F.3d 1283, 1287 (5th Cir. 1997) (refusing to reach question whether a regulation was legally valid because the plaintiff subject to or affected by it failed to bring suit in time). So whether the Forest Service regulations are valid we don't (and don't need to) say. It's enough Ms. George's predecessors were legally charged with knowing of them.

And that leaves Ms. George to try a different and more difficult path. She points out that before 2006 the Forest Service hadn't issued any citations or torn down any fences or taken any other actions to keep the road fence-free. And this, she says, means that she had no duty to bring her lawsuit before then. Reply Br. at 8-11. But even straining to overlook the fact that there were no fences for the

Forest Service to tear down before 2006 because it was only then Ms. George started building them, this argument still fails.

It fails because a range war isn't necessary to start the Quiet Title Act's limitations clock. The limitations period isn't triggered only when the government acts to *enforce* its claim — by tearing down a fence, issuing a citation, or the like. As we've already explained, by its plain terms the QTA is triggered by the government's *claim* — by its *assertion* of "some interest adverse" to the plaintiff or her predecessor. *Knapp*, 636 F.2d at 283; 3 Oxford English Dictionary at 261. "Our precedent does not allow plaintiffs to wait until the adverse claims of the title asserted by them and the United States crystallize into well-defined and open disagreements before commencing a quiet-title action." *Rio Grande Silvery Minnow*, 599 F.3d at 1188; *see also Rosette, Inc.*, 141 F.3d at 1398; *Vincent Murphy Chevrolet Co. v. United States*, 766 F.2d 449, 451 (10th Cir. 1985).

In fact, an appreciation of the "full contours" of the government's assertion or claim isn't even needed to start the QTA's clock. *Knapp*, 636 F.2d at 283. It is enough if the plaintiff or her predecessor knew or should have known of the existence of *some* assertion — some claim — by the government of an adverse right. *Id.; see also Spirit Lake*, 262 F.3d at 738 (the claim "need not be clear and unambiguous") (quotation omitted). And in this respect our case is much like *Knapp* itself. There we held a QTA claim accrued when the plaintiffs learned of

-10-

the government's claim to some interest in their land by way of a record search —
and long before the government *did* anything adverse to the plaintiff or
definitively asserted its claim to title. 636 F.2d at 283. Records, not actions,
were enough to put the plaintiffs on notice there and so they must be here.

Ms. George cites a pair of Ninth Circuit cases that, she says, compel us to a
different conclusion — *McFarland v. Norton*, 425 F.3d 724, 726-27 (9th Cir.
2005); *Michel v. United States*, 65 F.3d 130, 132 (9th Cir. 1995). Both cases
involved plaintiffs who owned easements running over government land. In
*Michel*, the government went so far as to assert that its mere claim of title to the
land was enough to start the limitations clock running. 65 F.3d at 131. But, as
the Ninth Circuit held in both cases and we agree, a government's claim of title to
land isn't always and inherently inconsistent with private ownership of an
easement over that land. Easements and servient estates can (and usually do)
peaceably coexist. To trigger the QTA, the Ninth Circuit held and again we
agree, there must be some claim, some assertion of an adverse interest. *Michel*,
65 F.3d at 132; *McFarland*, 425 F.3d at 726. Far from being inconsistent with
our holdings today, all this squares neatly with it. To the extent that Ms. George
attempts to tease something more out of the Ninth Circuit opinions — to the
extent she seeks a rule that a plaintiff need not bring suit until the government
*acts* adversely to her interests — we reject her invitation as inconsistent with the
plain terms of the QTA and our many precedents, discussed above, speaking

-11-

directly to the question. *See Rio Grande Silvery Minnow*, 599 F.3d at 1188;

*Knapp*, 363 F.2d at 283; *Rosette, Inc.*, 141 F.3d at 1398; *Vincent Murphy*

*Chevrolet*, 766 F.3d at 451.

And that leaves only one remaining issue. In her complaint, Ms. George

sought not only a right to fence across the road. She also argued that the Forest

Service failed to maintain the road and created dangerous erosion conditions. The

district court dismissed all her claims, however, reasoning that each was time-

barred. Ms. George now argues that, even accepting that her right-to-fence claim

accrued in 1979 and is time-barred, her maintenance and erosion claims accrued

later and survive. This line of argument, however, makes its first appearance in

our court. In the district court, Ms. George failed to suggest that her maintenance

and erosion claims warranted a separate and different accrual analysis than her

right-to-fence argument — and this, at the least, served to forfeit the point. *See*

*Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011). We can of

course vindicate on appeal an argument forfeited in the district court if the

appellant can show that the failure to do so would leave intact a plainly erroneous

result. But Ms. George does not even attempt such a showing for her

maintenance and erosion claims — and that is enough to seal their fate. *See id.*

Affirmed.