**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 25, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

SAN JUAN COUNTY, UTAH, a Utah
political subdivision,

        Plaintifff - Appellant,

and

STATE OF UTAH,

        Intervenor Plaintiff,

v.

UNITED STATES OF AMERICA;
DEPARTMENT OF INTERIOR;
NATIONAL PARK SERVICE,

        Defendants - Appellees.

----------------------------------------

SOUTHERN UTAH WILDERNESS
ALLIANCE; GRAND CANYON TRUST;
THE WILDERNESS SOCIETY; SIERRA
CLUB; NATIONAL PARKS
CONSERVATION ASSOCIATION,

        Amici Curiae.

No. 11-4146
(D.C. No. 2:04-CV-00552-BSJ)
(D. Utah)

STATE OF UTAH,

        Intervenor Plaintiff –
        Appellant.

and

SAN JUAN COUNTY, UTAH, a Utah
political subdivision,

        Plaintiff,

v.

DEPARTMENT OF INTERIOR;
NATIONAL PARK SERVICE; UNITED
STATES OF AMERICA,

        Defendants - Appellees.

----------------------------------------

SOUTHERN UTAH WILDERNESS
ALLIANCE; GRAND CANYON TRUST;
THE WILDERNESS SOCIETY; SIERRA
CLUB; NATIONAL PARKS
CONSERVATION ASSOCIATION,

        Amici Curiae.

No. 11-4149
(D.C. No. 2:04-CV-00552-BSJ)
(D. Utah)

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:04-CV-00552-BSJ)**

---

Anthony Rampton (Bridget K. Romano, Assistant Utah Attorney General and Mark L. Shurtleff, Utah Attorney General with him on the brief), Assistant Utah Attorney General, Salt Lake City, Utah for the Plaintiff-Appellant State of Utah.

Shawn T. Welch (Tamara L. Stevenson with him on the brief), Holland & Hart LLP, Salt Lake City, Utah for the Plaintiff-Appellant San Juan County, Utah.

Aaron P. Avila, Attorney, (Bruce D. Bernard, Attorney, Ignacia S. Moreno, Assistant Attorney General, U.S. Dep't of Justice Env't & Natural Resources Div., Washington, DC; David B. Barlow, United States Attorney, Carlie Christensen, Assistant United States Attorney, District of Utah, Salt Lake City, Utah; G. Kevin Jones, Office of

Regional Solicitor, Department of the Interior, Salt Lake City, Utah, with him on the brief), of U.S. Dep't of Justice Env't & Natural Resources Div., Washington, DC, for Defendant – Appellee.

Before **MURPHY**, **HOLLOWAY**[*], and **O'BRIEN**, Senior Circuit Judges.

**O'BRIEN**, Circuit Judge.

This Quiet Title Act case requires us to decide whether the district court erred in rejecting the claims of San Juan County and the State of Utah[1] to a public right-of-way, called Salt Creek Road, in Canyonlands National Park. We affirm.

## BACKGROUND AND PROCEDURAL HISTORY

Salt Creek Road is an unimproved 12.3-mile road intertwined with the creek bed in Salt Creek Canyon. The state and county wish to use their claimed right-of-way to prevent the United States from closing the Salt Creek Road to vehicle traffic.[2] The road

---

[*] The late Honorable William J. Holloway, United States Senior Circuit Judge, fully participated in this appeal and joined this panel opinion, which was then circulated to all circuit judges on April 1, 2014. He passed away before the opinion could be filed and published. "The practice of this Court permits the remaining two panel judges if in agreement to act as a quorum in resolving the appeal." *United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir.1997); *see also* 28 U.S.C. § 46(d) (noting circuit court may adopt procedures permitting disposition of an appeal where remaining quorum of panel agrees on the disposition). The remaining panel members have acted as a quorum with respect to the opinion and no judge of this Court has objected to its publication.

[1] The district judge granted Utah's motion to intervene as a plaintiff.

[2] Attachment A to this opinion provides a rough, not-to-scale map of the area in question. The map originates in the United States' brief. San Juan County tells us the

(Continued . . .)

- 3 -

is the primary way for tourists to reach several scenic sites within the Canyonlands

National Park, including Angel Arch. Without vehicle access, the only way to access

Angel Arch is to make the nine-mile trek by foot. As the state and county explain, this

trek renders Angel Arch inaccessible to many people, particularly those who lack the

physical ability to make arduous hikes.

The state and county base their claim on Revised Statute (R.S.) 2477. The statute

read simply: "[T]he right of way for the construction of highways over public lands, not

reserved for public uses, is hereby granted."[3] Congress enacted R.S. 2477 in 1866, and it

remained in effect until 1976.[4] Even then, however, Congress preserved the rights-of-

way established under the statute. *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*

(*SUWA*), 425 F.3d 735, 741 (10th Cir. 2005). Likewise, when Congress reserved

---

map is misleading in that it fails to show Cave Springs road "continu[ing] to travel east
from [the] Salt Creek road intersection." (Reply Br. of San Juan County 4.)
Nevertheless, the map provides a helpful visual aid to understanding the landmarks and
road closures pertinent to the case. Although the larger road system to which the claimed
road belongs (a system the United States refers to as "Salt Creek Route") connects to the
south side of the park, the terrain permits vehicle travel only from the park entrance to
Upper Jump.

[3] Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, *codified at* 43 U.S.C. § 932,
*repealed by* Federal Land Policy & Management Act of 1976, Pub. L. No. 94-579
§ 706(a), 90 Stat. 2743.

[4] Federal Land Policy & Management Act of 1976, Pub. L. No. 94-579 § 706(a),
90 Stat. 2743.

Canyonlands National Park in 1964, clearly preventing new rights-of-way across these public lands, it made the reservation "subject to valid existing rights."[5]

R.S. 2477 "'was a standing offer of a free right of way over the public domain.'" *SUWA*, 425 F.3d at 741 (quoting *Lindsay Land & Live Stock Co. v. Churnos*, 285 P. 646, 648 (Utah 1929)). The public need only accept it. *See id.* The question of whether a R.S. 2477 right-of-way has been accepted is a question of federal law. However, "to the extent that state law provides convenient and appropriate principles for [implementing] congressional intent," federal law "borrows" from it to "determin[e] what is required for acceptance of a right of way." *Id.* at 768 (quotation marks omitted).

Under Utah law, "[a] highway shall be deemed and taken as dedicated and abandoned to the use of the Public when it has been continuously and uninterruptedly used as a Public thoroughfare for a period of ten years." *Lindsay Land & Live Stock*, 285 P. at 648 (quoting ch. 12, Laws of Utah 1886, § 2); *accord* Utah Code Ann. § 72-5-104(1). Neither R.S. 2477 nor Utah law requires any "administrative formalities" or "formal act of public acceptance" of the right-of-way. *SUWA*, 425 F.3d at 741; *see Lindsay Land*, 285 P. at 648. Accordingly, disputes involving R.S. 2477 rights-of-way often require a close examination of historical evidence of public use. *SUWA*, 425 F.3d at 772-76 (elaborating on the historical facts of several typical cases).

---

[5] Pub. L. No. 88-950, § 1, 78 Stat. 934 (1964).

Thus, the issue at trial was whether the public had accepted an R.S. 2477 right-of-way on Salt Creek Road through "continuous public use for a period of ten years" prior to the reservation of the lands for Canyonlands National Park on September 12, 1964.[6] (Joint App'x Vol. II at 484-85.) During a nine-day bench trial, the state and county produced a variety of historical evidence as proof of such use. To summarize, the evidence showed (1) residential and grazing uses at a site south of the road beginning in the late 1880s or early 1890s; (2) cattle herding and grazing in Salt Creek Canyon starting around 1891 and increasing gradually through the 1950s; (3) nascent uses of the canyon by boy scouts and tourists beginning as early as 1950; and (4) some uranium mining and oil exploration in the mid- to late-1950s.

Following the trial, a judgment issued in favor of the United States. In the judge's view, although the state and county were able to show a variety of historical uses of the road, the evidence was not sufficient to show the road had been in continuous public use as a public thoroughfare throughout a ten year period prior to the reservation of Canyonlands National Park in September of 1964:

> During the 1950s, a visit to Salt Creek Canyon and Angel Arch was an experience marked by pristine solitude. Continuous public use of the plaintiffs' claimed right-of-way *as a public thoroughfare*—to reach Angel Arch or anywhere

---

[6] The United States closed the historical access road to the public in late 1968 or early 1969. Later, in the mid-1970s, the United States closed a portion of the road near, but to the south, of the section claimed by the state and county; the closure started "a short distance above (south of) Bates Wilson Campsite." (Ans. Br. of United States 14.)

else in Salt Creek Canyon—had not yet begun by September of 1954, and indeed did not commence for some time thereafter. By September of *1964*, it was certainly arguable that the plaintiffs' claimed right-of-way . . . up Salt Creek Canyon to Angel Arch was in continuous public use as a public thoroughfare, primarily for the purpose of scenic tourism by the growing number of visitors to the Canyonlands area, and for other uses as well. By then, the path of the road had arguably become discernable on the ground as it traversed the Salt Creek stream bed—at least to the extent that the tracks were not washed away by the recurring flood events that are typical of Salt Creek. But given the evidence presented at trial, and this court's findings based on that evidence, the same cannot be said for the ten years preceding September 12, 1964, and this court must conclude that the plaintiffs have failed to prove by clear and convincing evidence the requisite ten years of continuous public use of their claimed R.S. 2477 right-of-way as a public thoroughfare.

(Joint App'x Vol. 2 at 550-52 (footnotes omitted).)

## DISCUSSION

Contrary to the district judge's decision, the state and county tell us they have demonstrated the required ten years of continuous public use of Salt Creek Road prior to the park reservation in 1964. Although the United States is satisfied with the judge's merits decision, it contends sovereign immunity deprived the district court of jurisdiction. As it explains, this suit is premised on the waiver of sovereign immunity in the Quiet Title Act. It claims the limitation periods in the Act have expired, thereby preventing the state and county from taking advantage of the waiver.

## I. Quiet Title Act/Sovereign Immunity

Because the Quiet Title Act issue is jurisdictional, we consider it first. In doing so, "[w]e review de novo both the district court's determination of subject-matter jurisdiction and its ruling on the applicability of a statute of limitations." *Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation*, 599 F.3d 1165, 1175 (10th Cir. 2010). We review the district court's findings of jurisdictional fact for clear error. *Id.* Like the district judge, we conclude the claims of both the state and county are timely.

Normally, sovereign immunity shields the United States from suit. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *see Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 280 (1983). Unless the United States waives its sovereign immunity, thereby consenting to be sued, the federal courts lack jurisdiction to hear claims against it. *Meyer*, 510 U.S. at 475; *Block*, 461 U.S. at 280; *see United States v. Sherwood*, 312 U.S. 584, 587-88 (1941). The terms of the waiver "define [the] court's jurisdiction to entertain the suit." *Meyer,* 510 U.S. at 475 (quotation marks omitted).

The Quiet Title Act, under which the state and county brought their suit, is a limited waiver of sovereign immunity. *Rio Grande Silvery Minnow*, 599 F.3d at 1175. The Act provides the only way for claimants to "challenge the United States' title to real property." *Id.* Although the state and county jointly advance the same R.S. 2477 claim, the Act provides for both a general limitation period and a limitation period applicable

only to claims brought by states.  Accordingly, we discuss the claims of San Juan County and Utah separately.

A.  San Juan County's Claim

For claimants other than states, "Congress . . . limited the waiver" of sovereign immunity in the Quiet Title Act to actions filed within twelve years of the date of accrual. *Knapp v. United States*, 636 F.2d 279, 282 (10th Cir. 1980) (quoting 28 U.S.C. § 2409a(f) (now 28 U.S.C. § 2409a(g)); *see Rio Grande Silvery Minnow*, 599 F.3d at 1175.  The twelve-year period begins to run when the United States gives notice that it does not recognize (or will not continue to recognize) the legitimacy of a claimant's use of federal lands.  *George v. United States*, 672 F.3d 942, 946-47 (10th Cir.), *cert. denied*, 133 S. Ct. 432 (2012).  In other words, the period begins when the Quiet Title Act claimant "knew or should have known of the existence of *some* assertion—some claim— by the government of an adverse right."  *Id.* at 947.[7]  The "assertion" by the United States need only be sufficient to put potential plaintiffs on notice of the need to timely bring a quiet title action to protect their rights.  *See id.*  This is as an "exceedingly light" trigger "for starting [the] twelve-year clock running."  *Id*. at 944.  But it is a necessary one

---

[7] Although the county is a political subdivision of Utah, it correctly chose not to claim to be entitled to the more lenient limitation period applicable to suits by states.  *See Park Cnty., Mont. v. United States*, 626 F.2d 718, 720 (9th Cir. 1980); *see also N. Mariana Islands v. United States*, 279 F.3d 1070, 1072 (9th Cir. 2002) (discussing the differential treatment, with respect to the limitation period, of states relative to other Quiet Title Act plaintiffs).

because we are required to strictly construe the twelve-year limitation period in favor of the United States. *Rio Grande Silvery Minnow*, 599 F.3d at 1176. Since San Juan County filed its complaint on June 14, 2004, it is timely as long as the claim accrued no earlier than June 14, 1992.

The dispute over the timeliness of the county's claim centers on whether closures of roads within Salt Creek Canyon by the United States gave sufficient notice of its assertion of exclusive control. Two closures, illustrated in the attached map, are pertinent here. In 1969, the United States closed the "historical access road,"[8] which was used to access the Salt Creek Road from the Canyonlands' park entrance road, and constructed a new, more circuitous access road. Although the county does not claim a right-of-way to the historical access road, the United States argues the historical access road and the Salt Creek Road were merely different segments of the same continuous road. Thus, it explains, its closure of the historical access road placed the county on notice of its exclusive claim to the Salt Creek Road. The United States also points to its mid-1970s closure of a road segment south of the claimed road in Salt Creek Canyon.[9] This closure started just south of the Bates Wilson Camp and ran south through Upper Jump. While

[8] To be clear, our use of the term "historical access road" refers only to the small portion of the Salt Creek Road immediately northeast of Cave Spring. *See* Attachment A.

[9] Like the historical access road, this segment is not part of the road the county claims. And unlike the closure of part of the historical access road, the closure of this segment did not threaten to impede the public's access to the claimed Salt Creek Road.

- 10 -

this segment is located to the south of the claimed road, it is, like the historical access road, nearly adjacent to the claimed section of the road.

According to the county, these closures did not give notice of an exclusive claim because the United States continued to allow the public to use Salt Creek Road, which remained accessible via the new access road. In the county's view, the public's use under the right-of-way can "peaceably coexist," *George*, 672 F.3d at 947, with the ownership interest asserted by the United States.[10]

The Ninth Circuit's decision in *McFarland v. Norton* illustrates this peaceful coexistence. 425 F.3d 724, 727 (9th Cir. 2005). There, the claimant owned a parcel of land within Glacier National Park and sought to enforce an easement to a road serving as the primary route to the claimant's land. *Id.* at 725. The United States had engaged in a series of progressively more restrictive management activities, but the court concluded they were not sufficiently inconsistent with the claimed easement to put the claimant on notice of the United States' claim to *exclusive* ownership or exclusive control over the road. *Id.* at 727-28. In the 1950s, the United States stopped plowing the road. *Id.* Later, it banned snowmobiles. *Id.* In the 1970s, it erected wooden barriers but allowed the claimant to move them. *Id.* at 725. In 1976, it erected a locked cable barrier to prevent access, but unlocked the barrier whenever the claimant requested. *Id.* at 725-26. Finally,

---

[10] It appears the permit gate (*see* Attachment A) was put in place after 1995 and access down Salt Creek Road was thereafter limited; *see* discussion *infra* pp. 14-15.

in 1999, it told the claimant the road would be closed to everyone during the winter, and modified the lock system to deny the claimant winter access. *Id.* at 726. Although the United States freely exercised its "power to regulate" the road, none of its pre-1999 management activities started the limitation period because they did not put the claimant on notice of any "claim of exclusive ownership." *Id.* at 727. In essence, until the management activities were inconsistent with the claimed right-of-way, they did not provide the notice necessary to start the running of the limitation period.

The same principle applies here. Perhaps the closure and demolition of the short historical access road and construction of the new access road would be sufficient to put the county on notice of the United States' claim of its right to exclude others from using the historical access road. The same is, of course, true of the closure of the road segment to the south of the claimed right-of-way. But, as the judge found, the United States conscientiously ensured the public could continue to use Salt Creek Road. Because the public continued to have access to Salt Creek Road consistent with the claimed right-of-way, neither of the United States' road closures provided the county with sufficient notice of the United States' claim of a right to exclude the public, as would be necessary to assert a claim of exclusive ownership to Salt Creek Road (its right to exclude offers). *See George*, 672 F.3d at 947.

The United States bristles at this result. It intimates the claim to the road was artificially constructed to omit any portion of the road for which the county might have had some notice of the United States' claim. The United States may be right, but we see

- 12 -

no reason this is improper. As the original plaintiff, the county is master of its own

claim. *Cf. Schmeling v. NORDAM,* 97 F.3d 1336, 1339 (10th Cir. 1996) (observing

plaintiffs, as "master[s] of the claim," may prevent removal by omitting federal claims,

"even if one is available"). As such, it may properly limit the scope of its claim to avoid

both untimely claims and issues irrelevant to the Angel Arch access they wish to

preserve. The county's claim is timely.

B. Utah's Claim

Utah's claim presents a somewhat different timeliness issue. As we read Utah's

brief, it advances two rationales for the timeliness of its claim. First, in its view, the

United States has done nothing to trigger the Quiet Title Act's limitation period. And,

Utah argues, even if the United States' actions did trigger the limitation period, its claim

is timely.

The general trigger for the twelve-year limitation period in the Quiet Title Act is

not applicable to states. 28 U.S.C. § 2409a(g) ("Any civil action under this section,

*except for an action brought by a State,* shall be barred unless it is commenced within

twelve years of the date upon which it accrued.") (emphasis added). For states, the

trigger is different because it requires more than fair notice; it requires substantial activity

by the United States:

> Any civil action brought by a State under this section with
> respect to lands, other than tide or submerged lands, on which
> the United States . . . has made substantial improvements or
> substantial investments or on which the United States has
> conducted substantial activities pursuant to a management

- 13 -

plan such as range improvement, timber harvest, tree planting, mineral activities, farming, wildlife habitat improvement, or other similar activities, shall be barred unless the action is commenced within twelve years after the date the State received notice of the Federal claims to the lands.

28 U.S.C. § 2409a(i).

### 1. Applicability of the Limitation Period in § 2409a(i)

Utah first challenges the applicability of the limitation period in § 2409a(i). It argues the activities the United States has undertaken on Salt Creek Road are not the kinds of substantial activities listed in the statute. Therefore, it says, because the condition precedent (substantial activity by the federal government) has not been met, its claim does not fall within the ambit of § 2409a(i)'s limitation period. We cannot stretch the statute that far.

As the record demonstrates, the United States has conducted "substantial activities" with respect to the road. It reserved the land as Canyonlands National Park in 1964. It reconstructed the park's access road. It repaired and maintained the Salt Creek Road to ensure it remained passable for vehicles. This has included significant work to restore the road after floods. Because of these activities, the twelve-year limitation period in § 2409a(i) applies to Utah's claim.

### 2. Notice

Nevertheless, Utah's claim is timely. Unlike the Quiet Title Act's general limitation period, the Act's state-specific limitation period begins to run only when "the

State receive[s] notice of the Federal claims to the lands." 28 U.S.C. § 2409a(i). A state receives notice either (1) "by public communications with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands" or (2) "by the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious." *Id.* § 2409a(k). As with the general limitation period, the only notice sufficient to start the limitation period is notice of an *adverse* claim. *See George*, 672 F.3d at 947.

According to the United States, the road closures discussed above, combined with a variety of other park management activities, show it provided Utah notice of its claim to "exclusive jurisdiction and control over Salt Creek Canyon and Salt Creek route since 1964." (Ans. Br. of United States 40.) These activities include (1) a 1965 Master Plan, which proposed the destruction of the historical access road; (2) the National Park Service's 1970 recommendation that the upper canyon be designated as wilderness; (3) the 1977 "Assessment of Alternatives" "proposing further vehicle closures" (*Id.* at 41); (4) the 1992 Federal Register notice of the preparation of an updated backcountry management plan "encompass[ing] visitor use and roads" (*Id.*); and (5) its routine management of the road, including repairs, maintenance, closures, and regulation of vehicle traffic.

Yet, as with the road closures, these activities did not put Utah on notice of a claim by the United States *adverse* to Utah's claimed right-of-way. Throughout all of these activities, the Salt Creek Road remained fully accessible to the public. Indeed, the

- 15 -

maintenance activities served to ensure the public continued to have access to the road. The first time the United States limited the public's access to the road was sometime after January 1995, when the Park Service implemented the backcountry management plan's proposed day-use permit system. This system allowed only ten private vehicles and two commercial vehicles to use the Salt Creek Road each day. Even this restriction may not have been sufficiently adverse to put Utah on notice of the United States' claim of exclusive ownership, but, assuming it was, Utah's claim, filed on April 22, 2005, is timely.

## II. Acceptance of the Salt Creek Road as a Public Right-of-Way

The state and county contend they demonstrated acceptance of an R.S. 2477 right-of-way through ten years of continuous public use of Salt Creek Road prior to the reservation of Canyonlands National Park in 1964. In particular, they argue the district judge erred in (1) requiring them to show the public used the road with any frequency greater than "the public finds . . . convenient or necessary" (Opening Br. of San Juan County 26 (quotation marks omitted)); (2) requiring a showing of a "jeep road" or a "discernable *road*" (*Id.* at 30 (quotation marks omitted)); (3) disregarding evidence of uses occurring under a private right; (4) disregarding evidence showing Salt Creek Road was used by a variety of users since the late 1800s; and (5) concluding their claims must be proven by clear and convincing evidence. We see no error.

In this appeal from a bench trial, our review of the district judge's application of the law is de novo. *Keys Youth Servs., Inc. v. City of Olathe, Kan.*, 248 F.3d 1267, 1274

- 16 -

(10th Cir. 2001). We reverse factual determinations only if they are clearly erroneous. *Id.* That occurs when a factual finding lacks any support in the record or leaves us "with a definite and firm conviction that a mistake has been made." *Id.* (quotation marks omitted). "If the district court's account of the evidence is plausible in light of the record . . ., [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 565 (1985). This is so "regardless of whether the district court's factual findings are based on credibility determinations or on documentary evidence." *La Resolana Architects, PA v. Reno, Inc.*, 555 F.3d 1171, 1177 (10th Cir. 2009).

The parties agree on the general contours of the applicable law. As right-of-way claimants, the burden of proof of establishing an R.S. 2477 right-of-way lies with the state and county. *SUWA*, 425 F.3d at 768-69. This burden requires the claimants to show the public accepted the R.S. 2477 right-of-way by using it continuously as a public thoroughfare for ten years prior to reservation of rights by the United States.[11] *See id.* at 771.

---

[11] Under Utah law, the public accepts an R.S. 2477 right-of-way through continuous public use "as a Public thoroughfare for a period of ten years." *Lindsay Land*, 285 P. at 648 (quoting chapter 12, Laws of Utah 1886, § 2); *accord Wasatch County v. Okelberry*, 179 P.3d 768, 772-73 (Utah 2008); *SUWA*, 425 F.3d at 771.

A.  Frequency of Use

The parties part ways, however, in their understanding of what the "continuous public use as a public thoroughfare for a period of ten years" standard requires.  The state and county first complain of the district judge's requirement of "direct proof of an ill-defined frequency of use." (Opening Br. of San Juan County 24.)  In their view, no particular frequency of use is required; the standard is satisfied when the public use is as often as the public finds convenient or necessary during the ten-year period.  As they explain the law, the standard merely requires ten years of public use uninterrupted by any act of the United States intended to interfere with the public's use; whatever it may have been.

While we agree uninterrupted use is necessary, it is not alone sufficient to demonstrate the existence of a public thoroughfare for purposes of R.S. 2477.  As we will explain, frequency or intensity of use is probative of the existence of a "public thoroughfare," and, to the extent recent changes to Utah law minimize the importance of this factor, it nevertheless remains pertinent under federal law.

Under Utah law, the "continuous public use as a public thoroughfare for a period of ten years" standard has three components:  (1) continuous use; (2) a public thoroughfare; and (3) a ten-year-minimum period of use.  *See Utah Cnty. v. Butler*, 179 P.3d 775, 780 (Utah 2008).  The ten-year minimum is self-explanatory and the Utah courts have elaborated on the other two components of this standard.

"Continuous" in this context means "without interruption." *Wasatch County v. Okelberry*, 179 P.3d 768, 774 (Utah 2008). It includes any frequency of uninterrupted use, so long as the use occurs "as often as the public finds it convenient or necessary." *Id.* at 774. *But see Heber City Corp. v. Simpson*, 942 P.2d 307, 312 (Utah 1997) (applying "convenient or necessary" as an inquiry to the *purposes* of use rather than the *frequency* of use).

The "public thoroughfare" element refers to "a place or way through which there is passing or travel" by the public. *Heber City Corp.,* 942 P.2d at 311 (quotation marks omitted); *Jennings Investment, LC v. Dixie Riding Club, Inc.*, 208 P.3d 1077, 1081 (Utah Ct. App. 2009). To demonstrate the existence of a public thoroughfare, a claimant must show: "(i) passing or travel, (ii) by the public, and (iii) without permission." *Jennings Inv.*, 208 P.3d at 1081; *see Heber City,* 942 P.2d at 311.

Although frequency (or intensity) of use is not an explicit component of the "public thoroughfare" analysis, it has always been pertinent to establishing sufficient "passing or travel" "by the public." *See SUWA*, 425 F.3d at 771 ("The decisions make clear that occasional or desultory use is not sufficient."). For instance, in *Lindsay Land*, the Utah Supreme Court found the claimed road was used by the public generally. 285 P. at 648. It reasoned the evidence showed both frequent and varied use. *Id.* ("[T]he road was used by many and different persons for a variety of purposes [and] the use made of it was as general and extensive as the situation and surroundings would permit, had the road been formally laid out as a public highway by public authority."). While the

frequency of use need not be "great," it must be sufficient to call the road a "public thoroughfare." *See Boyer v. Clark*, 326 P.2d 107, 108-09 (Utah 1958); *see also Thomson v. Condas*, 493 P.2d 639, 641 (Utah 1972) (intermittent or occasional use by hunters, fisherman, and shepherds, farmers, and miners is not sufficient); *Harding v. Bohman*, 491 P.2d 233, 234 (Utah 1971) (occasional use by deer hunters is insufficient); *Cassity v. Castagno*, 347 P.2d 834, 834-35 (Utah 1959) (regular use by a single cattleman for driving cattle is insufficient).

### 1. Significance of Recent Changes in Utah Law

The state and county resist this interpretation of Utah law. In their view, two 2008 cases from the Utah Supreme Court, *Wasatch County v. Okelberry*, 179 P.3d 768 (Utah 2008), and *Utah County v. Butler*, 179 P.3d 775 (Utah 2008), announced a new interpretation of the "continuous public use as a public thoroughfare for a period of ten years" standard. They argue these cases should not be interpreted, as we have done, in accord with Utah's prior case law because the Utah Supreme Court specifically intended to jettison its prior standard as unworkable. *See Okelberry,* 179 P.3d at 774. And, they say, under this new interpretation, frequency of use is not a pertinent consideration.

Although we believe the "public thoroughfare" element still requires a showing of sufficiently frequent public use, we acknowledge these recent Utah cases can be plausibly read to reject any inquiry into frequency of use. In *Okelberry*, the Utah Supreme Court determined that "continuous[] use[] as a public thoroughfare" required use only "as often as the public finds convenient or necessary." 179 P.3d at 774. The essential meaning of

- 20 -

"continuous[] use[] as a public thoroughfare," the *Okelberry* court explained, is not *frequent* use, but use *uninterrupted* by an "overt act . . . intended by a property owner to interrupt the use of [the] road as a public thoroughfare." *Id.*

Even if the interpretation advanced by the state and county is correct, we nevertheless conclude it does not apply here. Federal law governs our interpretation of R.S. 2477. *SUWA*, 425 F.3d at 768. True, R.S. 2477 was enacted "against a backdrop of common law, without any indication of intention to depart from or change common law rules." *Id.* at 763. Stated another way, state common law has provided "convenient and appropriate principles for [carrying out] congressional intent," and we have used it in the past to determine how the public can accept an R.S. 2477 right-of-way and to elaborate on the term "highway." *Id.* at 768; *see id.* at 782 (defining "highway"). However, state law ceases to provide "convenient and appropriate principles" when it contravenes congressional intent. *See id.* at 767-68. Assuming, arguendo, frequency of use is no longer pertinent under Utah law as interpreted in *Okelberry* and *Butler*, this interpretation contravenes Congress' express intent in two ways.

First, as *Lindsay Land* demonstrates, frequency and variety of use were critical common-law inquiries into the acceptance of an R.S. 2477 right-of-way. 285 P. at 648. While it is difficult to crystallize in a verbal formula the precise level of use necessary for acceptance of an R.S. 2477 right-of-way, *SUWA*, 425 F.3d at 772, the Utah Supreme Court's new standard defies sensible application in the R.S. 2477 context. Taking the new Utah standard at its word, a right-of-way could spring into being at the most

- 21 -

infrequent use of a path by a member of the public, so long as the use remained

uninterrupted for ten years.[12]  Not only does such a lenient standard clash with the

common-law standard, it also eliminates the effect of the limiting phrase "for the

construction of highways" in the text of R.S. 2477:  "[T]he right of way *for the*

*construction of highways* over public lands, not reserved for public uses, is hereby

granted" (emphasis added).  Thus, the "as often as the public finds convenient or

necessary" standard departs from Congress' intent in enacting R.S. 2477.  The limiting

phrase "for the construction of highways" should be read as congruent with the common-

law understanding of "public thoroughfare" [13] and the multi-factor common-law analysis

exemplified in *Lindsay Land.*  285 P. at 648; *see SUWA*, 425 F.3d at 763 (reasoning R.S.

2477's "statutory terms must be read as embodying their common law meaning").

---

[12] Moreover, such meager uses may, reasonably, escape notice by federal authorities or, if noticed, be tolerated because of their insignificance.  We are unwilling to presume such trivial events are sufficient to establish a public thoroughfare across federal lands.

[13] This definition is consistent with the common understanding of the term "thoroughfare."  Merriam-Webster's online dictionary, at http://www.merriam-webster.com/dictionary/thoroughfare, defines "thoroughfare" as:
> **1 :** a way or place for passage:  as
>> **a :** a street open at both ends
>> **b :** a main road

Cambridge Dictionaries Online, at http://dictionary.cambridge.org/us/dictionary/american-english/thoroughfare, is more direct:  a "thoroughfare" is "a road that connects to other roads."

Second, and perhaps more importantly, when Congress repealed R.S. 2477, it chose to preserve only those rights-of-way existing on the date of repeal, October 21, 1976. *See Sierra Club v. Hodel*, 848 F.2d 1068, 1083 & n.14 (10th Cir. 1988) (noting scope of R.S. 2477 right-of-way is determined with respect to state law as of date of repeal of statute), *overruled on other grounds*, *Village of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992). Applying the Utah Supreme Court's more lenient 2008 standard would retroactively broaden the public's eligibility for R.S. 2477 rights-of-way beyond what Congress could have intended to preserve.

The intensity of public use remains a pertinent component in determining the existence of a public thoroughfare. The district judge did not err in considering it.

B. Proprietary Interests

The state and county also argue certain cattle-grazing uses of the Salt Creek Road should have been considered. The district judge found these uses were not particularly probative as to the existence of a public thoroughfare because the users had "proprietary interests in upper Salt Creek."[14] (Joint App'x Vol. II at 545.)

The evidence at trial suggested one of the more prominent uses of the Salt Creek Road prior to the reservation of Canyonlands National Park was cattle ranching. Cattle ranchers—particularly the ranchers of the Scorup-Somerville Cattle Company—used Salt

---

[14] Although San Juan County complains there was no evidence to support the district court's reference to grazing permits, the record supports this reference. (Joint App'x Vol. 7 at 1807-1809; Vol. 9 at 2330-2375; Vol. 10 at 2597-2625.)

Creek Road to move cattle between winter and summer grazing. The judge concluded the cattle-grazing evidence did not establish the existence of a public thoroughfare because (1) the grazing use occurred pursuant to federal grazing permits and a "1942 deed to 80 acres of land near Kirk's Cabin," and (2) "it would strain the language to characterize [the ranchers'] presence as a 'public' use, or [to say the] Salt Creek Canyon was then being used as a 'public thoroughfare.'" (*Id.*)

Again, the judge properly considered these facts. As to the grazing permits, the Utah courts have consistently held "'[u]se under private right is not sufficient'" to demonstrate public use. *Heber City*, 942 P.2d at 311 (quoting *Morris v. Blunt*, 161 P. 1127, 1131 (Utah 1916)); *see Butler*, 179 P.3d at 782; *Jennings Inv.*, 208 P.3d at 1082. The judge did not err in disregarding use under private right in considering the existence of a public thoroughfare.

The state and county suggest the grazing permits and deed only authorized the grazing, not the travel to and from the grazing sites. That is a stretch, but even if true, the trial judge still did not err in concluding the cattle grazing did not establish a public thoroughfare. Indeed, the Utah Supreme Court reached the same conclusion on similar facts in *Cassity*. 347 P.2d at 834-35. There, although the claimant regularly drove his cattle along a strip of land to reach winter grazing lands, this use was not sufficient to establish the strip as a public highway. *Id.* Here, similarly, the cattle-grazing uses were not, by themselves, sufficient to demonstrate the existence of a public thoroughfare. During much of the time in question, the cattle-grazing appeared to be the only apparent

- 24 -

use of the road, and the grazing was primarily done by a single user—the Scorup-Somerville Cattle Company.  This was not use "by many and different persons for a variety of purposes."  *See Lindsay Land*, 285 P. at 648.

The assessment of the cattle-grazing evidence was properly done.

C.  Constructed Jeep Road/Discernible Road Standard

The state and county also argue the district judge erred in "requir[ing] a constructed jeep road."  (Opening Br. of San Juan County 30.)  We see no error.

Although R.S. 2477 was a grant for the "construction of highways over public lands," mechanical construction is not necessary to prove a R.S. 2477 right-of-way.  *SUWA*, 425 F.3d at 777-78.  Nevertheless, "evidence of actual construction (appropriate to the historical period in question), or lack thereof, can be taken into consideration as evidence of the required extent of public use, though it is not a necessary or sufficient element."  *Id.* at 778.

This is what the trial judge did.  He did not *require* a constructed jeep road.  Rather, he considered the presence (or lack) of a discernible road as probative of whether a public thoroughfare existed.  He noted that, as scenic tourism developed in the late 1950s and early 1960s, the road began to become "discernable on the ground."  (Joint App'x Vol. 2 at 551.)  He explained how this lack of a discernible road during the ten years prior to the reservation of Canyonlands National Park was consistent with the "pristine solitude" prevailing in the Salt Creek Canyon at the time.  (*Id.* at 550.)  And, he considered this evidence alongside the other evidence probative of the existence of a

public thoroughfare.  Under our precedent, this use of the evidence was correct and permissible.  *See SUWA*, 425 F.3d at 778.

D.  Full Consideration of the Evidence

The state and county also argue the trial judge either glossed over or disregarded evidence of the public's use of the road.  Both emphasize the evidence of use of Salt Creek Road extending back to 1890. According to Utah, for instance:

> Beginning in 1890 and continuing for more than 100 years, homesteaders . . . , ranchers . . . , miners, and adventurers . . . forged, and thereafter used as desired, a road through Salt Creek Canyon that stretched more than 12 sandy miles, meandering in and out [of] a streambed, but always taking the user where it was convenient and necessary to go.

(Opening Br. of Utah 47.)

The state and county put on a strong case, but so did the United States.  In the end, whether the public used the claimed road continuously for ten years prior to the reservation of the park is a factual issue.  It is the role of the judge to weigh the evidence presented at a bench trial.  *See Keys Youth Servs.*, 248 F.3d at 1274-75.  The trial judge determined both the credibility and relative persuasiveness of the evidence presented. *See id.*  We have carefully reviewed those determinations, and they do not leave us with a "definite and firm conviction that a mistake has been made."  *See id.*  Nor can we identify any factual findings without support in the record.  *See id.*  There was no clear error in the assessment of the evidence.

E.  Evidentiary Standard

Because the judge correctly concluded the evidence of the existence of a public thoroughfare failed to satisfy either the more lenient "preponderance of the evidence" standard or the more stringent "clear and convincing evidence" standard, we need not resolve the dispute over the proper standard.

## CONCLUSION

The state and county failed to carry their burden of establishing ten years of continuous public use of the Salt Creek Road as a public thoroughfare prior to reservation of Canyonlands National Park in 1964.

AFFIRMED.

# ATTACHMENT: ROADMAP WITH LANDMARKS

