# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-3489

_____

North Dakota, ex rel. Drew H. Wrigley,[1] Attorney General for the State of North Dakota

*Plaintiff - Appellant*

Billings County, ND, a municipal entity; Golden Valley County, ND, a municipal entity; McKenzie County, ND, a municipal entity; Slope County, ND, a municipal entity

*Plaintiff*s

v.

United States of America

*Defendant - Appellee*

------------------------------

Badlands Conservation Alliance; Sierra Club

*Amici on Behalf of Appellee(s)*

_____

---

[1]The current officeholder is automatically substituted as a party pursuant to Federal Rule of Appellate Procedure 43(c)(2).

No. 20-3492

_____

North Dakota, ex rel. Drew H. Wrigley, Attorney General for the state of North Dakota

*Plaintiff*

Billings County, ND, a municipal entity; Golden Valley County, ND, a municipal entity; McKenzie County, ND, a municipal entity; Slope County, ND, a municipal entity

*Plaintiffs - Appellants*

v.

United States of America

*Defendant - Appellee*

------------------------------

Badlands Conservation Alliance; Sierra Club

*Amici on Behalf of Appellee(s)*

_____

Appeal from United States District Court
for the District of North Dakota - Western

_____

Submitted: October 21, 2021
Filed: April 14, 2022

_____

Before COLLOTON, SHEPHERD, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge

North Dakota and several counties—Billings County, Golden Valley County, McKenzie County, and Slope County—(collectively, Plaintiffs), filed suit in the District of North Dakota to quiet title to certain portions of the Dakota Prairie Grasslands managed by the United States Forest Service (USFS), an agency within the United States Department of Agriculture (USDA). The United States moved to dismiss, arguing that the statute of limitations for the quiet title action had run. The district court[2] granted the government's motion, and Plaintiffs appealed. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

In 1866, to encourage the expansion of the United States, Congress enacted Revised Statute (RS) 2477, granting the right-of-way for construction of highways over public lands without need for application or license from the federal government. North Dakota was not yet a state, but in 1871, the Dakota Territory enacted a law that "accepted" the grant in RS 2477 and declared all section lines in the territory to be "public highways as far as practicable." When North Dakota was admitted as a state, in 1889, this provision became a state law and today is codified at § 24-07-03 of the North Dakota Century Code. The statute provides that "the congressional section lines are considered public roads open for public travel to the width of thirty-three feet [10.06 meters] on each side of the section lines."[3]

During the 1930s, the federal government acquired much of the land that is now the Dakota Prairie Grasslands. In the 1950s, USFS was given the responsibility for management of the grasslands, subject to "existing valid rights." Then in 1976,

---

[2]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

[3]Section lines are grid lines used in land surveying and mapping. Section lines are generally one mile apart and create a grid of one-square-mile sections. They are not themselves physically visible on the land, and an individual would need a map or a survey to know where a section line existed unless something physical, such as a road or a fence, had been constructed along the section line.

Congress enacted the Federal Land Policy and Management Act, which repealed RS 2477 but preserved any valid right-of-way existing on the date of enactment. On this basis, North Dakota asserts that its statutory acceptance of RS 2477 prior to 1976 created a valid encumbrance on the section lines in the portions of the Dakota Prairie Grasslands within North Dakota that continues to this day.

This case began in 2012, when the Counties filed suit to quiet title to section line rights-of-way within the Little Missouri National Grassland, a section of the Dakota Prairie Grasslands located within those counties, and six individual roads located in McKenzie County. Shortly thereafter, the State also sought to quiet title to section line rights-of-way in the Little Missouri grassland and two other parts of the Dakota Prairie Grasslands—the Sheyenne National Grassland and the Cedar River National Grassland. The district court consolidated the two suits. The United States moved to dismiss all of the State's claims and the Counties' claim as to the Little Missouri National Grassland pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that the district court lacked subject matter jurisdiction because the statute of limitations for the quiet title actions had already run. The district court granted that motion, dismissing the State's Amended Complaint and the first count of the Counties' Third Amended and Supplemental Complaint. The district court then held a bench trial as to the Counties' six other claims. The State and the Counties now appeal the district court's dismissal of their claims as to the section lines in the Little Missouri, Sheyenne, and Cedar River National Grasslands.

## II. LEGAL STANDARD

The United States expressly abrogated its sovereign immunity in civil actions "to adjudicate a disputed title to real property in which the United States claims an interest" in 28 U.S.C. § 2409a, known as the Quiet Title Act (QTA). When the QTA was enacted in 1972, it imposed a 12-year statute of limitations that begins to run "on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(f) (1972). In 1986, the QTA was amended. The original standard—"knew or should have known"—still applies

to quiet title actions brought by any plaintiff other than a state, see 28 U.S.C. § 2409a(g) (2012), but the QTA now provides as follows regarding actions by states:

> Any civil action brought by a State under this section with respect to lands, other than tide or submerged lands, on which the United States or its lessee or right-of-way or easement grantee has made substantial improvements or substantial investments or on which the United States has conducted substantial activities pursuant to a management plan such as range improvement, timber harvest, tree planting, mineral activities, farming, wildlife habitat improvement, or other similar activities, shall be barred unless the action is commenced within twelve years after the date the State *received notice* of the Federal claims to the lands.

Id. § 2409a(i) (emphasis added).[4] The statute defines "notice" as either: "public communications with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands," or "the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious." Id. § 2409a(k).[5]

---

[4]Before the district court, North Dakota challenged whether the Dakota Prairie Grasslands are the type of land subject to the 12-year statute of limitations, as described in § 2409a(i). The district court concluded that they are, and North Dakota does not appeal that aspect of the decision. We therefore focus only on the notice to North Dakota of the government's claim.

[5]North Dakota and the government agree that the current version of the QTA governs the State's claims. The district court suggested, however, that the prior version of the QTA might apply if the actions that triggered the running of the statute were taken prior to the 1986 amendments. In holding that certain Travel Plans and Public Notices triggered the running of the statute before 1986, the district court noted that it would reach the same conclusion under either the original "knew or should have known" standard or the "actual notice" requirement of the amended statute. Because we agree with the district court that the State's claims are barred regardless of which standard is applied, we assume, without deciding, that the higher burden imposed by the current statute is applicable to these facts. The standard as to the Counties' claims is the same under either version.

"[W]hen Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied." Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287 (1983). "When waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity." Id. In such situations, "although we should not construe such a time-bar provision unduly restrictively, we must be careful not to interpret it in a manner that would extend the waiver beyond that which Congress intended." Id. (quotation omitted). Because the statute of limitations in the QTA is a jurisdictional bar, Spirit Lake Tribe v. North Dakota, 262 F.3d 732, 738 (8th Cir. 2001), and the district court dismissed the claims for lack of subject-matter jurisdiction, we review the dismissal de novo, Jones v. United States, 727 F.3d 844, 846 (8th Cir. 2013).

## III.  ANALYSIS

In granting the government's motion to dismiss, the district court identified the following actions by USFS as triggering the running of the statute of limitations as to the section line rights-of-way in the Dakota Prairie Grasslands: the 1976 and 1977 Travel Plans for the Sheyenne National Grassland and the Little Missouri National Grassland, respectively, and the Public Notices in 1982, 1984, and 1988 as to the Sheyenne National Grassland.[6]

---

[6]The government identified other actions it argued also gave Plaintiffs notice of its adverse claim. The district court rejected these other actions as triggering the running of the statute, and the government renews some of those arguments before this court. Since we agree with the district court that the statute of limitations was triggered by the Travel Plans and Public Notices, we do not address the government's alternative instances of notice or its argument that its "use, occupancy, or improvement" of the land gave notice.

The 1976 Travel Plan for the Sheyenne National Grassland restricted motor vehicle use within particular areas of the grassland to "existing routes and snowmobiles operating on snow." The Travel Plan also noted that USFS would "honor the North Dakota Century Code Section 20.1-01-07" regarding motor vehicle use during big game hunting season. The Travel Plan provided for enforcement through the "issuance of travel maps," "personal contact by Forest Service personnel," "weekend patrols," and signage at "each entrance to the National Grassland where restrictions apply."

The following year, the Little Missouri National Grassland Travel Plan imposed similar restrictions in that grassland. The Plan designated sections of the Little Missouri grassland as Map Code 1 or Map Code 2. In areas designated as Map Code 1, motorized vehicles were permitted only on "existing roads," with specific exceptions for hunting season drawn from North Dakota state law. The Travel Plan defined "existing road" as "a route traveled by four-wheeled vehicles that shows recurring use of more than one year's duration with soil displacement and compaction present to the extent that vegetation is sparse or absent from wheel tracks." In Map Code 2, the use of motorized vehicles was not restricted except during certain hunting seasons. The Travel Plan restrictions did "not apply to State or County roads systems." To implement the Travel Plan, USFS distributed travel maps, displayed posters "on main access routes into designated areas of restriction and around the perimeter of the Limber Pine Management Unit," and had personnel perform patrols. This Travel Plan was in effect from May 25, 1977, until early 1979.

The Public Notices as to the Sheyenne National Grassland issued in 1982, 1984, and 1988 were variations on the same theme. The first notice restricted motor vehicle use within the Hankinson Unit (located within the Sheyenne National Grassland) to existing roadways except for snowmobiles traveling over snow of an average depth of 12 inches, travel to campsites within 300 feet of the existing roadway, or for retrieval of big game during hunting season as permitted by state law. A Public Notice issued in 1984 for the Hankinson Unit restated the restrictions in the 1982 notice and added a prohibition on use of motor vehicles on the "defacto

Hankinson motorcross run." In 1984, USFS identified portions of the Sheyenne National Grassland as Map Code 1 or 2 and imposed limitations similar to those contemplated by the Little Missouri National Grassland Travel Plan, including the same definition of "existing road." Similar restrictions were imposed by Public Notice in 1988.

In challenging the district court's conclusion that these Travel Plans and Public Notices put Plaintiffs on notice of the government's adverse claim and triggered the running of the statute of limitations as to Plaintiffs' quiet title actions, Plaintiffs first argue that the government could not have made a claim adverse to the section line rights-of-way in the 1970s and 1980s because the State had a valid and existing right to those easements. Because North Dakota accepted the grant of rights-of-way offered by RS 2477 before it was repealed and declared all section lines to be "public highways," Plaintiffs argue, there was a valid and existing claim to the easement when the Land Policy and Management Act was enacted in 1976, since it preserved any valid right-of-of way in existence at that time.

This argument improperly collapses the jurisdictional question with the merits of Plaintiffs' quiet title actions. It may be that North Dakota has a valid encumbrance on the section lines dating all the way back to 1871. But that does not prevent the government from making an adverse claim, and the statute of limitations begins to accrue even if that adverse claim lacks merit. See Spirit Lake Tribe, 262 F.3d at 738 ("Even invalid government claims trigger the QTA limitations period."); see also George v. United States, 672 F.3d 942, 946 (10th Cir. 2012) ("The merits of that claim or assertion of adverse interest are irrelevant. One can be on *notice* of a claim even if that claim lacks any legal *merit*. Were the rule otherwise, of course, the statute of limitations and merits inquiries would collapse and involve no analytically distinct work."). Here, the court must focus its inquiry on whether Plaintiffs had the

requisite notice of a potential adverse claim by the government, and not whether such a claim would have any merit.[7]

Thus, the question for the court is whether USFS's Travel Plans and Public Notices gave Plaintiffs notice, as defined by the QTA, that the government believed it had the power to restrict access to the 33 feet on either side of the section lines within the Dakota Prairie Grasslands. As noted above, the statute of limitations began to run as to the Counties when they "knew or should have known" of the government's claim, 28 U.S.C. § 2409a(g) (2012), and we assume that the statute of limitations would not begin to run as to the State until the government issued "public communications" that were "sufficiently specific as to be reasonably calculated" to give the State notice of the government's claim. Id. § 2409a(k). North Dakota does not dispute that the Travel Plans and Public Notices are "public communications" for purposes of the QTA. But it argues that those communications were not sufficient notice to trigger the running of the statute of limitations. We hold that they were.

First, we note that in the context of a right-of-way, the government must claim exclusive control of the area over which the right-of-way is alleged. "As a public right-of-way can generally peaceably coexist with an underlying ownership interest, the United States must provide a county or state with sufficient notice of the United States' claim of a right to exclude the public." Kane Cnty. v. United States, 772 F.3d 1205, 1216 (10th Cir. 2014) (cleaned up) (quotations and citations omitted). In Kane County, for example, federal designation of an area as wilderness did not constitute notice of a claim adverse to the right-of-way where "valid existing rights, including

---

[7]North Dakota's claim that the operative regulations did not give USFS the authority to restrict access to the 33 feet on each side of the section lines within the national grassland, and that the State therefore lacked notice of the adverse claim, fails for the same reason. North Dakota argues that USFS only had the authority to restrict the use of areas over which it had jurisdiction or to close forest development roads, not section lines the State had designated as public roads. See 36 C.F.R. § 261.50(a), (b) (1977). But this goes to the merits of North Dakota's quiet title action, which are not before this court.

rights-of-way, were excepted" by the Department of the Interior, and the Bureau of Land Management did not take any action to limit public access. Id. at 1217, 1218. Similarly, where the government closed a historical access road to a public right-of-way and a southern portion of the road but built a new access road through which the right-of-way remained accessible, the government's activities did not constitute a claim adverse to the claimed right-of-way since the "public continued to have access to Salt Creek Road consistent with the claimed right-of-way." San Juan Cnty. v. United States, 754 F.3d 787, 794, 796 (10th Cir. 2014). In contrast, in Park County v. United States, 626 F.2d 718 (9th Cir. 1980), the case on which the district court relied, the Ninth Circuit held that where USFS posted a sign stating, "Entering Absaroka Primitive Area Motor Vehicles Prohibited Gallatin National Forests," and placed a rock barrier across the right-of-way in front of the sign, this put the counties on notice of the government's adverse claim. Id. at 720–21.

Here, the Travel Plans and Public Notices were sufficient notice of the government's exclusive claim to the 33 feet on either side of the section lines within the Dakota Prairie Grasslands over which Plaintiffs claim a right-of-way. These communications indicate that USFS claimed the authority to restrict motor vehicle access within the grasslands without regard to the claimed rights-of-way along the section lines that crossed federal land, since at least some of the section lines would not constitute "existing roads" as defined by USFS. Unlike in San Juan County, where the public still had access to the right of way, motor vehicles were not permitted along section lines in the areas USFS designated as Map Code 1. And the government erected signs, distributed travel maps, and planned patrols to implement its plan, further publicizing its claim as it did in Park County. Thus, we conclude that the statute of limitations as to North Dakota's quiet title action began to accrue more than 12 years before it brought this suit, and its claim is time-barred. For the same reasons, the Counties either knew or should have known about the government's adverse claim with the implementation of the Travel Plans and Public Notices, and their claim is also barred by the statute of limitations.

-10-

Yet the Counties emphasize that several of the relevant documents include the proviso that the restrictions "do not apply to State and County system roads." They argue that they did not have notice of the government's exclusive adverse claim because they reasonably concluded that this proviso exempted the section line rights-of-way that had been claimed by state statute as "public roads." It is clear under North Dakota law, however, that the "state highway system" and the "county road system" are networks of roads designated by state and county officials based on specific factors, such as traffic volume, and subject to limits on total length and requirements as to maintenance. See N.D. Cent. Code §§ 24-01-01.1(10) & (42) (1970) (defining "state highway system" and "county road system"); id. § 24-01-01.2 (limiting the total mileage of the state highway system to 7,700 miles); id. § 24-01-02 (listing the factors the commissioner "shall take into account" in designating state highways); id. § 24-05-16 (setting a limit of 22,500 total miles for the county road system, allocating those miles by county, and listing the factors to be considered in designating such roads); id. § 24-01-03 (allocating responsibility for construction and maintenance of the state highway system); id. § 24-05-17 (same as to county road system). By their statutory description, then, state and county system roads are a specific subset of public roads. Section lines are not included in the definition of either road system. And again, the issue before the court is not whether the government's claim was meritorious but whether it was sufficient to put the Counties on notice of the government's adverse claim. Given the language of the relevant state statutes, we conclude that the Counties knew or should have known that USFS did not recognize an easement over the 33 feet on either side of the section lines within the national grasslands even though the Travel Plans and Public Notices contained an exception for state and county system roads.

Next, the Counties argue that the government abandoned its adverse claim to the section line rights-of-way in the Little Missouri National Grassland. First, the Counties assert that because the Little Missouri National Grassland Travel Plan imposed temporary restrictions, USFS abandoned its claim when the restrictions expired. The Counties acknowledge that they make this argument for the first time on appeal. Second, the Counties assert that the government abandoned its adverse

claim when it recognized section line rights-of-way in a settlement agreement entered into in 2006 and amended in 2007.

In Spirit Lake Tribe, this court held that "the government's outright abandonment" of a claim "extinguishes [a plaintiff's] obligation to file a quiet title action within 12 years" and that if the government "later reasserts an adverse claim, the reasserted claim is properly regarded as a new claim and a new 12-year period begins in which a plaintiff may file his QTA action against the government." 262 F.3d at 739. Whether the government has abandoned its claim is a fact-based inquiry. See id. (noting that the plaintiff tribe's argument that the government abandoned title to disputed land in a certain memo "require[d] [the court] to review the circumstances that gave rise to [the] memo in considerable detail"); see also Shultz v. Dep't of Army, 886 F.2d 1157, 1161 (9th Cir. 1989) (reversing the district court's dismissal of the case as time-barred where there remained a factual dispute as to whether the government abandoned its adverse claim to plaintiff's right-of-way when it stopped restricting access to the disputed road). Because the Counties raise their temporary restrictions argument for the first time on appeal, however, they have waived resolution of this fact-intensive issue. See Universal Title Ins. Co. v. United States, 942 F.2d 1311, 1314–15 (8th Cir. 1991) (holding that the court may exercise its discretion to consider newly raised issues "where the proper resolution is beyond any doubt, or where injustice might otherwise result, or when the argument involves a purely legal issue in which no additional evidence or argument would affect the outcome of the case" (cleaned up) (quotations and citations omitted)).

Nor can the 2006 settlement agreement be construed as the government abandoning its claim. The settlement agreement resolved an action in which the Counties sued the USDA over a "Roadless Rule" that covered the national grasslands in North Dakota. Pursuant to the settlement, the parties agreed to "undertake a road reconciliation process" that would include section line rights-of-way. While the settlement agreement, as amended by the subsequent supplemental agreement, provides that the Counties may make a "request for acknowledgment by USDA" of particular rights-of-way, it gives the USDA exclusive authority to

-12-

"determine whether to endorse the Counties' request for acknowledgment" of a "candidate public road, easement, or right-of-way" for a "recordable disclaimer of interest," underscoring the unilateral, and therefore adverse, nature of the government's claimed authority. The settlement also stipulates that "the determinations made by USDA in deciding whether to acknowledge a . . . right-of-way cannot be challenged under this agreement; rather, any challenge to ownership interests asserted by the United States must be asserted in a separate action under the terms of the Quiet Title Act." This language gives the USDA the unilateral authority to determine which section line rights-of-way it will endorse as to the Counties and which it will not, and if the Counties disagree with the USDA's determination, their remedy is a QTA action. As such, the agreement more readily supports the government's adverse claim to section lines on federal land than its abandonment thereof.

Finally, Plaintiffs argue that if this court finds that the Travel Plans and Public Notices did put Plaintiffs on notice of the government's adverse claim, any such notice was only as to the section lines that fall within the specific areas where motor vehicle access was restricted. But the government's decision to restrict motor vehicles in some areas and not in others is premised on its claimed authority to determine where motor vehicles may travel within the entire Dakota National Grasslands, without regard to the claimed section line rights-of-way. Unlike in San Juan County, in which the government "conscientiously ensured" the public's continued access to the disputed right-of-way, 754 F.3d at 794, USFS never protected access to the section lines within any part of the national grasslands. Rather, USFS's Travel Plans and Public Notices asserted its claimed authority to regulate motor vehicles within the entirety of the grassland as it saw fit, even though it chose to restrict access in some areas and to leave other areas open to motor vehicles. Thus, the Travel Plans and Public Notices made an adverse claim as to all the national grasslands within North Dakota, including areas over which USFS chose not to restrict travel. Cf. North Dakota ex rel. Bd. of Univ. & Sch. Lands v. Block, 789 F.2d 1308, 1313–14 (8th Cir. 1986) (reversing the district court's "tract-by-tract" approach to assessing the government's claim to ownership rights where the

-13-

government's claim of interest in every tract was premised on a single legal theory). The government's reasoning that it could close section lines in some areas of the grasslands based on its control of the land extends to section lines in other areas of the grasslands that it chose to leave open at the time.

For these reasons, we agree that Plaintiffs' quiet title actions are time-barred and affirm the decision of the district court.

_____