**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 2, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

KANE COUNTY, UTAH, a Utah
political subdivision,

      Plaintiff - Appellant/Cross-
        Appellee,

and

THE STATE OF UTAH,

      Intervenor Plaintiff -
      Appellant/Cross-Appellee,

v.

UNITED STATES OF AMERICA,

      Defendant - Appellee/Cross-
        Appellant.

------------------------

SIERRA CLUB; GRAND CANYON
TRUST; NATIONAL PARKS
CONSERVATION ASSOCIATION;
SOUTHERN UTAH WILDERNESS
ALLIANCE; THE WILDERNESS
SOCIETY,

      Amici Curiae.

Nos. 13-4108, 13-4109 & 13-4110

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 2:08-CV-00315-CW)**

---

Shawn T. Welch (Tamara L. Stevenson and Ryan R. Jibson of Holland & Hart, L.L.P., on the briefs), Salt Lake City, Utah, for Plaintiff - Appellant - Cross-Appellee.

David C. Shilton (Thomas K. Snodgrass and Romney S. Philpott of United States Department of Justice, Env't & Natural Resources Department; Robert G. Dreher and Sam Hirsch, Acting Assistant Attorney Generals; James E. Karkut and Aaron G. Moody, Of Counsel, U.S. Department of the Interior, Office of the Solicitor; on the briefs), Washington, D.C., for Defendant - Appellee - Cross-Appellant.

Anthony L. Rampton, Harry H. Souvall, Bridget K. Romano, Assistant Attorneys General, Sean D. Reyes, Utah Attorney General, Salt Lake City, Utah, for Intervenor Plaintiff - Appellant - Cross-Appellee State of Utah.

Heidi J. McIntosh and Alison C. Flint of Earthjustice, Denver, Colorado, for Amici Curiae Sierra Club.

Stephen H.M. Bloch, David T. Garbett and Joseph J. Bushyhead of Southern Utah Wilderness Alliance, Salt Lake City, Utah; Matthew S. Hellman, Jerome L. Epstein and Caroline M. DeCell of Jenner & Block, L.L.P., Washington, D.C., for Amici Curiae Southern Utah Wilderness Alliance and The Wilderness Society.

---

Before **KELLY**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

This case involves a dispute between Kane County, Utah (joined by the State of Utah as intervenors) and the United States over the existence and breadth of the County's rights-of-way on federally owned land in Southern Utah. We previously affirmed the denial of intervention to the Southern Utah Wilderness Alliance, the Wilderness Society and the Sierra Club. Kane Cnty. v. United States, 597 F.3d 1129 (10th Cir. 2010). On March 20, 2013, the district court issued two final orders, see Kane Cnty. v. United States, 934 F. Supp. 2d 1344

(D. Utah 2013) [hereinafter Kane I]; Kane Cnty. v. United States, No. 2:08–cv–00315, 2013 WL 1180764 (D. Utah Mar. 20, 2013) [hereinafter Kane II], both of which are challenged in this appeal and cross-appeal. Our jurisdiction arises pursuant to 28 U.S.C. § 1291. We consider five issues involving the application of the Quiet Title Act, 28 U.S.C. § 2409a, and Section 8 of the Mining Act of 1866, more commonly known as "Revised Statute (R.S.) 2477." We affirm in part, reverse in part, and remand.

Background

In April of 2008, Kane County brought an action under the Quiet Title Act (QTA), 28 U.S.C. § 2409a, to quiet title to five roads or road segments. It later amended its complaint to cover a total of fifteen roads or road segments. The QTA supplies a limited waiver of sovereign immunity for the settlement of property claims against the United States.

Kane County asserts rights-of-way over these roads pursuant to R.S. 2477, which states that "the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." An Act granting the Right of Way to Ditch and Canal Owners over the Public Lands, and for other Purposes, ch. 262, § 8, 14 Stat. 251, 253 (1866) (codified at 43 U.S.C. § 932), repealed by Federal Land Policy and Management Act of 1976 (FLPMA), Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2793. R.S. 2477 was "a standing offer of a free right of

way over the public domain." San Juan Cnty. v. United States, 754 F.3d 787, 791 (10th Cir. 2014) (quoting S. Utah Wilderness Alliance (SUWA) v. Bureau of Land Mgmt., 425 F.3d 735, 741 (10th Cir. 2005)). Though R.S. 2477 was repealed in 1976 by the FLPMA, it preserved existing rights-of-way. 43 U.S.C. 1769(a).

On February 26, 2010, the State of Utah filed a motion to intervene as co-plaintiff and the motion was granted. In August 2011, the district court held a nine-day bench trial that included the testimony of 26 witnesses and over 160 exhibits. On March 20, 2013, the district court issued two orders. In the first order, the district court held it had subject matter jurisdiction under the QTA over each of the fifteen roads at issue. See Kane I, 934 F. Supp. 2d 1344. In the second order, the district court made findings of fact and addressed the merits of Kane County and Utah's claims, finding they had proven R.S. 2477 rights-of-way on twelve of the fifteen roads at issue and setting proper widths for the rights-of-way. See Kane II, 2013 WL 1180764. Both orders are challenged in this appeal.

Plaintiffs-Appellants and Cross-Appellees Kane County and Utah challenge two of the district court's determinations. First, they argue the district court erred in finding that Public Water Reserve 107 reserved from the operation of R.S. 2477 two parcels of lands crossed by Swallow Park/Park Wash Road ("Swallow Park Road"). Second, they contend the district court erred in requiring that R.S. 2477 rights-of-way be proven against the United States by clear and convincing

- 4 -

evidence.

Defendant-Appellee and Cross-Appellant United States also raises two issues. First, it contends the district court lacked jurisdiction over Kane County's claims regarding the Sand Dunes, Hancock and four Cave Lakes roads because of the absence of a "disputed title to real property in which the United States claims an interest," 28 U.S.C. § 2409a(a), a prerequisite to federal court jurisdiction under the QTA. Second, the United States contends the district court erred in determining the widths of Plaintiffs' rights-of-way on Swallow Park Road, North Swag Road, and Skutumpah Road.

Additionally, amici Southern Utah Wilderness Alliance (SUWA), the Wilderness Society and the Sierra Club (collectively "amici") contend the district court lacked jurisdiction over Kane County's R.S. 2477 claim to North Swag Road because the QTA's limitations period had already run. This issue pertains to subject matter jurisdiction, a matter "essential to this court's review," which we would address "without regard to whether the parties dispute its existence." Elliot Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1104 (10th Cir. 2005). Accordingly, we address it alongside the jurisdictional arguments raised by the United States.

The issues before this court thus implicate nine roads: Sand Dunes Road, Hancock Road, the four Cave Lakes roads (denominated as K1070, K1075, K1087 and K1088), Swallow Park Road, North Swag Road and a portion of Skutumpah

- 5 -

Road. The facts regarding these roads are discussed as they are pertinent to each issue.

## Discussion

A.      Quiet Title Act Jurisdiction

The United States and amici contend the district court lacked subject matter jurisdiction over certain of the QTA claims. The United States contends Kane County brought claims to roads on which no "disputed title" existed and amici contend Kane County brought claims to roads on which the QTA limitations period had run. The district court rejected these arguments, and we review its determinations de novo. See Rio Grande Silvery Minnow v. Bureau of Reclamation, 599 F.3d 1165, 1175 (10th Cir. 2010).

The United States cannot be sued absent a waiver of sovereign immunity. See Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 280 (1983). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969). The QTA provides such a waiver:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a *disputed title* to real property in which the United States *claims an interest*.

28 U.S.C. 2409a(a) (emphasis added). The QTA provides the "exclusive means by which adverse claimants [can] challenge the United States' title to real

- 6 -

property." Block, 461 U.S. at 286. District courts are granted jurisdiction over § 2409a suits under 28 U.S.C. § 1346(f).

Thus, for a court to have jurisdiction over a QTA claim, the plaintiff must establish that: (1) the United States "claims an interest" in the property at issue; and (2) title to the property is "disputed." See Leisnoi, Inc. v. United States (Leisnoi II), 267 F.3d 1019, 1023 (9th Cir. 2001).[1] The district court found these two elements satisfied as to each of the fifteen roads at issue. The United States argues that the grounds on which the court found "disputed title" to Sand Dunes, Hancock and the four Cave Lakes roads were insufficient under § 2409a(a).

The issue of what is required to satisfy the QTA's "disputed title" requirement is one of first impression in this circuit. In interpreting § 2409a(a), we begin with the established principle that waivers of sovereign immunity are to be read narrowly and conditions on the waiver are to be "strictly observed." Block, 461 U.S. at 287; see also Mills v. United States, 742 F.3d 400, 405 (9th Cir. 2014) ("In construing the scope of the QTA's waiver, we have read narrowly the requirement that the title at issue be 'disputed.'").

---

[1] Though some courts appear to combine the two QTA elements into one, see, e.g., Alaska v. United States, 201 F.3d 1154, 1160 (9th Cir. 2000) (analyzing the issue as whether the United States "claim[ed] an interest"); Mills v. United States, 742 F.3d 400, 405 (9th Cir. 2014) (relying on Alaska but analyzing the issue simply as whether a "disputed title" exists), most courts appear to follow Leisnoi II and analyze the elements separately, as did the district court. See, e.g., Mich. Prop. Ventures, LLC v. United States, No. 14–10215, 2014 WL 2895485, at *4–6 (E.D. Mich. June 26, 2014).

The parties rely on a pair of Ninth Circuit cases analyzing the scope of § 2409a(a)'s waiver of sovereign immunity. In <u>Alaska v. United States</u>, Alaska's title to the Kandik, Nation and Black rivers depended upon whether the rivers were navigable at the date Alaska obtained statehood. 201 F.3d 1154, 1156–57 (9th Cir. 2000). QTA jurisdiction thus hinged on whether the United States had claimed an interest in the rivers by asserting they were not navigable at the time of statehood. Before the district court, the United States refused to admit or deny Alaska's allegations that the rivers were navigable at statehood. Despite the United States' failure to formally claim an interest in the case at hand, the Ninth Circuit found it had claimed an interest in the Kandik and Nation rivers. The court relied upon the Unites States' previous assertion before an administrative law judge that the rivers were not navigable at statehood, explaining that this past assertion created a "present cloud on the state's title." <u>Id.</u> The court expressed a preference against allowing potential federal claims to "lurk over the shoulder of state officials as they try to implement a coherent management plan" for the state's waterways. <u>Id.</u> at 1161. However, the court found no QTA jurisdiction over the Black River because the United States never "expressly asserted a claim" to it. <u>Id.</u> at 1164.

Though <u>Alaska</u> dealt with whether the United States "claimed an interest" in the rivers, other Ninth Circuit cases have applied this "cloud on title" standard to the "disputed title" element of § 2409a(a). <u>See</u> <u>Leisnoi II</u>, 267 F.3d at 1024

(holding the "disputed title" requirement of the QTA can be satisfied by a third-party's assertion of an interest of the United States that "clouds the plaintiff's title"); Leisnoi, Inc. v. United States (Leisnoi I), 170 F.3d 1188, 1192 (9th Cir. 1999). However, more recently in Mills, the Ninth Circuit did not reference the "cloud on title" standard and emphasized that the "disputed title" requirement must be "read narrowly." 742 F.3d at 405. In Mills, a miner sought access to a mine site over an R.S. 2477 right-of-way and brought suit under the QTA. Id. at 403–05. The court found no "disputed title" where land management agency officials had previously denied the plaintiff's petitions for a right-of-way on the grounds that they lacked the legal authority to grant the petition. Id. at 405–06. The court explained that the United States had not "expressly dispute[d]" the plaintiff's title, nor had it "taken an action that implicitly disputes" the title. Id.

To the extent the Ninth Circuit still utilizes a "cloud on title" standard, we would reject it as incompatible with the rule that conditions on a waiver of sovereign immunity are to be specifically observed. See Block, 461 U.S. at 287. The "cloud on title" standard provides little guidance to parties as to what constitutes a title dispute and could lead federal courts to issue advisory opinions. Instead, we hold that to satisfy the "disputed title" element of the QTA, a plaintiff must show that the United States has either expressly disputed title or taken action that implicitly disputes it.

Under this standard, a plaintiff need not show the United States took direct

action to close or deny access to a road—indirect action or assertions that actually conflict with a plaintiff's title will suffice. Nor is the United States shielded by sovereign immunity where it previously disputed a plaintiff's title but does not do so presently. Cf. Alaska, 201 F.3d at 1162. Thus, concerns about potential claims "lurk[ing] over the shoulder of state officials" are ameliorated. Id. at 1161. However, actions of the United States that merely produce some ambiguity regarding a plaintiff's title are insufficient to constitute "disputed title." This accords with both the purpose of the QTA—allowing parties to settle disputes with the United States over land—and the principle that waivers of sovereign immunity are construed narrowly.

We now turn to each of the roads at issue in this appeal.

1. Sand Dunes and Hancock Roads

Sand Dunes Road is a 20-mile road running from the Utah-Arizona border to Utah State Highway 89. Near Sand Dunes is Hancock Road, a paved, two-lane road roughly ten miles in length. Both roads fall within the land administered by the Kanab Field Office, a branch of the Bureau of Land Management (BLM).

On October 31, 2008, the Kanab Field Office released the Kanab Field Office Management Plan ("the Plan"). Kane I, 934 F. Supp. 2d at 1353. The Plan provides guidance for the management of roughly 554,000 acres of land administered by the BLM and was based on "a complete route inventory in 2005 and 2006." Id. It specifies that "[n]atural and cultural resource protection is . . .

accomplished by limiting motorized travel to the routes designated." Id. However, the Plan explicitly states it "*does not* affect valid existing rights" and "*does not* adjudicate . . . or otherwise determine the validity of claimed rights-of-way." Id. (emphasis added).

Map 9 of the Plan identifies areas that are open to cross-country, motorized vehicle use, closed to such use, or open only on designated routes. Hancock and Sand Dunes roads fall in an area where off-highway vehicle use is "Limited to Designated Open Roads and Trails." Id. Map 10 of the Plan shows which routes in the designated area are open, closed, or limited for motor vehicle use. Hancock and Sand Dunes roads are not identified in Map 10. On January 30, 2009, after Kane County filed its amended complaint to include these roads, BLM published additional maps on its website identifying Hancock and Sand Dunes roads as "Class 3 primary roads," a term used to denote major thoroughfares. The changes to the maps were not the product of a formal amendment process. Id.

The district court found that the Plan's omission of Hancock and Sand Dunes roads from the initial maps had the practical effect of closing the roads. Id. at 1357. Because the republished maps were not the product of a formal amendment process, the court held that an "ambiguity" existed as to the legal status of the roads, creating a "cloud on title" sufficient for jurisdiction under § 2409a(a). Id. at 1354, 1358. We disagree.

The effect of the Plan's omission of Sand Dunes and Hancock roads is at

- 11 -

best ambiguous and insufficient to create a disputed title under § 2409a(a).  The

Plan *explicitly* declared it did not adjudicate or affect rights-of-way.  Further,

though the Plan marked certain roads as closed, Hancock and Sand Dunes were

not marked as closed; they simply were not marked at all.  Though a provision of

the Plan suggested travel was limited to designated routes, the effect of this

provision is unclear, as the United States took no action to limit travel to such

routes.  Regardless of whether the United States was entitled to clarify the

original maps with additional maps online, see id. at 1357–58, the original maps

did not amount to a disputed title.  The district court was correct in concluding an

"ambiguity exist[ed] regarding the legal status of the roads," id. at 1354;

however, this ambiguity is insufficient to constitute a "disputed title" under

§ 2409a(a).

Kane County relies upon several other grounds for finding a "disputed title"

to the Sand Dunes, Hancock and four Cave Lakes roads that were not addressed

by the district court.  Kane Reply Br. 9–17.  The County does not explain how

any of these grounds create a "disputed title" to Sand Dunes, Hancock or the Cave

Lakes roads specifically, and so we find its argument without merit.  Thus, we

reverse the district court and find it had no jurisdiction over the QTA claims to

Sand Dunes and Hancock roads.


2.     The Four Cave Lakes Roads

a.        The United States' Answer

The Cave Lakes roads (denominated as K1070, K1075, K1087 and K1088) are four short roads in southwestern Kane County crossing BLM-administered land. All four were designated as "open" under the Kanab Field Plan. Kane I, 934 F. Supp. 2d at 1354. Paragraph 29 of Kane County's amended complaint stated: "After 1866 and prior to the repeal of R.S. 2477 on October 21, 1976, Kane County, by and on behalf of the public, accepted R.S. 2477 rights-of-way for . . . the Cave Lakes roads." JT App. 41. The United States' answer as to this paragraph stated: "The allegations . . . are legal conclusions to which no responsive pleading is required. To the extent a responsive pleading is required, the United States lacks sufficient information to form a belief as to the truth of the allegations." Id. at 113. Under Fed. R. Civ. P. 8(b)(5), this response is treated as a denial. The district court found this denial of the allegations created a "disputed title" sufficient for jurisdiction under the QTA. Kane I, 934 F. Supp. 2d at 1358. We disagree.

The district court likened the United States' answer to Alaska, where the Ninth Circuit held that a past claim of interest before an administrative law judge as to the Nation and Kandik Rivers amounted to a present "cloud" on the plaintiff's title. 201 F.3d at 1162. However, Alaska itself found no jurisdiction over the QTA claim to the Black River where, as here, the United States refused to admit or deny allegations of the river's navigability at the pleading stage

- 13 -

because the allegations "consist[ed] of conclusions of law not requiring an answer." Id. at 1163–65. Alaska thus suggests that a failure to admit allegations cannot alone suffice to show a "disputed title" under § 2409a(a). Though a disclaimer of title by the United States does operate to remove the jurisdiction of the court under the QTA, see 28 U.S.C. § 2409a(e), a disclaimer is not necessary for the United States to challenge jurisdiction under § 2409a(a). See Leisnoi I, 170 F.3d at 1192 ("Subsection (a) is the one that confers jurisdiction . . . . Nothing in subsection (e) qualifies those requirements."). Moreover, as a practical matter, requiring the United States to either admit allegations or waive sovereign immunity under § 2409a(a) would place a tremendous and unfair burden upon it at the pleading stage. Thus, we conclude the United States' answer is insufficient to constitute a "disputed title" under § 2409a(a).

       b.      <u>The United States' Grant of Title V Permits</u>

As to three of the Cave Lakes roads (K1070, K1075 and K1087), the district court found that the BLM's grant of Title V permits to private entities provided an additional ground for "disputed title" under § 2409a(a). On July 25, 2008, the BLM issued Title V permits to a private entity to use these three roads. Supp. App. 337–55. The Title V permits grant the right to "construct, operate, maintain, and terminate an access road for the purpose of accessing private property on public lands." Id. at 337. The permits state that roads must be "surfaced to specifications set by Kane County for a subdivision road and to Kane

- 14 -

County standards for subdivision roads with a travel surface of 28 feet." Id. at 338. The permits are "not intended to extinguish or limit any R.S. 2477 right-of-way," and if an R.S. 2477 right-of-way was found by a court or the Secretary of the Interior, the permit "would be superseded thereby." Id. The district court held these permits "conflict[ed] with Kane County's ability to manage its alleged rights-of-way" and thus amounted to a dispute of title under 2409a(a). Kane I, 934 F. Supp. 2d at 1358. We disagree.

Nothing about the grant of Title V permits to third parties expressly or implicitly disputes Kane County's right-of-way. "Easements and servient estates can (and usually do) peaceably coexist." George v. United States, 672 F.3d 942, 947 (10th Cir. 2012). Here, the permits require that the roads be maintained in accordance with Kane County standards. Further, like the Kanab Field Plan, the Title V permits state they do not affect R.S. 2477 rights-of-way; even more, they *explicitly* state they are "superseded" by any R.S. 2477 rights-of-way. The permits, if anything, seem a deliberate attempt *not* to dispute Kane County's title.

To be sure, "owners of the dominant and servient estates 'must exercise [their] rights so as not unreasonably to interfere with the other.'" S. Utah Wilderness Alliance (SUWA) v. Bureau of Land Mgmt., 425 F.3d 735, 746 (10th Cir. 2005) (quoting Big Cottonwood Tanner Ditch Co. v. Moyle, 174 P.2d 148, 158 (Utah 1946)). But, Kane County has produced no evidence as to how the permits interfered with any development plans. Absent such evidence, we must

- 15 -

conclude that the Title V permits do not create a "disputed title" under § 2409a(a).

Thus, as to all four of the Cave Lakes Roads (K1070, K1075, K1087 and K1088) we reverse the district court's finding of jurisdiction under the QTA.

3.     North Swag Road – QTA Limitations Period

Amici contend that the district court lacked jurisdiction over Plaintiffs' R.S. 2477 claim to North Swag Road because the QTA's limitations period had already run.  The district court found that the limitations periods had not run, Kane I, 934 F. Supp. 2d at 1360–64, and the United States has not challenged this finding on appeal.  At an earlier stage of litigation, the United States in fact conceded the QTA limitations period had not run.  See Kane Cnty. v. United States, No. 2:08–CV–00315, 2011 WL 2489819, at *7 (D. Utah June 21, 2011).  Nevertheless, the QTA's limitations period is a jurisdictional bar, see Rio Grande Silvery Minnow, 599 F.3d at 1175–76, and thus we address it.

As discussed above, the QTA provides the exclusive means by which claimants can challenge the United States' title to real property.  But, "what the QTA gives it often proceeds to take away."  George, 672 F.3d at 944.  The QTA provides two limitations provisions, one for non-states and one for states.  Section 2409a(g), applicable to non-states including counties, provides:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued.  Such action shall be deemed to have

- 16 -

accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g). Thus, the twelve-year limitations period for non-states is triggered when a party knows or should know of a claim of the United States.

As to states, the QTA provides that for land on which the United States has made "substantial improvements" or has "conducted substantial activities pursuant to a management plan," actions are barred unless commenced "within twelve years after the date the State received notice of the Federal claims to the lands." Id. § 2409a(i). "Notice" for states must be either by public communications "sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands" or "by the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious." Id. § 2409a(k)(1)–(2). Both the 2409a(g) and 2409a(i) standards are relevant here, as amici argue the limitations periods ran on both Kane County and Utah's QTA claims.

In interpreting the QTA's limitations provisions, we begin again with the familiar proposition that waivers of sovereign immunity are construed narrowly and conditions upon the waiver strictly observed. Block, 461 U.S. at 287. This court has held that the trigger for starting the QTA limitations period is an "exceedingly light one." George, 672 F.3d at 944. A "range war" is not required, and plaintiffs cannot wait until the United States' claims to title "crystallize into

- 17 -

well-defined and open disagreements." Id. at 946–47 (quoting Rio Grande Silvery Minnow, 599 F.3d at 1188). Concrete action by the United States is not required; "[a]ll that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." Knapp v. United States, 636 F.2d 279, 283 (10th Cir. 1980). Thus, though "[k]nowledge of the claim's full contours" is unnecessary, id., the plaintiff must be on notice of an *adverse* interest asserted by the government. George, 672 F.3d at 946.

This court recently explained in San Juan County v. United States that in order to trigger the QTA limitations period against a party claiming an R.S. 2477 right-of-way, the United States must claim "exclusive control" of a road. 754 F.3d 787, 793 (10th Cir. 2014); see also McFarland v. Norton, 425 F.3d 724, 727 (9th Cir. 2005) (requiring an exclusive claim to trigger the QTA limitations period against a party claiming a right-of-way); Michel v. United States, 65 F.3d 130, 132 (9th Cir. 1995) (same). As a public right-of-way can generally "peaceably coexist" with an underlying ownership interest, see George, 672 F.3d at 947, the United States must provide a county or state with "sufficient notice of the United States' claim of a right to exclude the public." San Juan Cnty., 754 F.3d at 794.

Amici contend that two events triggered the QTA limitations periods: (1) the BLM's 1980 designation of the Paria-Hackberry Wilderness Study Area and publication of this designation in the Federal Register; and (2) a 1991 meeting of

the Kane County Commissioner with BLM representatives to discuss the procedures necessary for obtaining recognition of R.S. 2477 rights-of-way. The district court found these events insufficient to trigger the QTA limitations period, and we review its determinations de novo. See Rio Grande Silvery Minnow, 599 F.3d at 1175.

      a.      The 1980 Designation of the Paria-Hackberry WSA

In 1976, as part of a "statutory sea change," Congress passed the Federal Land Policy and Management Act (FLPMA), initiating a "conservation and preservation" approach to federal land management. SUWA, 425 F.3d at 741. Pursuant to the FLPMA, the Secretary of the Interior was directed to conduct an inventory of "those roadless areas of five thousand acres or more" to determine which areas had wilderness characteristics as defined by the Wilderness Act. 43 U.S.C. § 1782(a). An area of wilderness was defined to mean "an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation." 16 U.S.C. § 1131(c).

On November 14, 1980, the BLM published its Final Intensive Inventory Decision for Utah in the Federal Register. See 45 Fed. Reg. 75,602 (Nov. 14, 1980). This inventory designated Paria-Hackberry, which encompassed North Swag Road, as a Wilderness Study Area (WSA). Upon designation of land as a WSA, the Secretary of the Interior is directed to manage such lands "in a manner so as not to impair the suitability of such areas for preservation as wilderness"

and to "take any action required to prevent unnecessary or undue degradation of the lands and their resources." 43 U.S.C. § 1782(c). This standard requires the BLM to "ensure that an area's existing wilderness values are not degraded" in a manner that might threaten the WSA's designation as protected wilderness. Interim Management Policy and Guidelines for Land Under Wilderness Review (IMP), 44 Fed. Reg. 72,014 (Dec. 12, 1979).

Though the FLPMA applies to "roadless" areas, a "road" for purposes of the Wilderness Act is not coterminous with a "road" under R.S. 2477. The same year the BLM designated the Paria-Hackberry WSA, the BLM Director for Utah issued a memorandum stating the following:

> The wilderness inventory process uses a definition of a road that is distinct from the definition of "public" road contemplated by R.S. 2477 (43 USC 932) and is a definition for inventory purposes only, not for establishing rights of counties, etc. A determination that an area should not be excluded from wilderness review because the area does not have any "roads" as defined in the Bluebook is not a determination that a road is or is not a "public" road. This is a factual determination that does not relate to wilderness . . . .

Instruction Memorandum No. UT '80-240 (Mar. 6, 1980), JT App. 2300–01. A subsequent nationwide BLM memorandum stated that where WSAs overlap with R.S. 2477 rights-of-way, "the WSA/wilderness designation is subject to the terms and conditions of the pre-existing R/W grant." Instructional Memorandum No. 90-589 (Aug. 15, 1990), JT App. 2295; see also id. at 2296 (noting that R.S. 2477 rights-of-way "may in fact exist within a WSA"); IMP, 44 Fed. Reg. 72,015

- 20 -

(WSAs "shall be subject to valid existing rights").  Moreover, an opinion from the Secretary of the Interior shortly after the Paria-Hackberry WSA designation explained that valid existing rights, including rights-of-way, were excepted from the non-impairment requirements of 43 U.S.C. § 1782(c).  See United States Dep't of the Interior Solicitor's Opinion M-36910, 88 I.D. 909, 1981 WL 29226 (Oct. 5, 1981).  In light of this evidence, the district court found that the Paria-Hackberry designation did not constitute an adverse claim to North Swag and was thus insufficient to trigger the QTA limitations period.

Amici argue the designation of Paria-Hackberry as a WSA and publication of this designation were sufficient to give Kane County and Utah notice of the claim of the United States.  They contend this claim was adverse to the rights of Kane County and Utah because the WSA designation meant that the land was to remain "roadless" and imposed upon the BLM a duty to manage the roads on a non-impairment standard that conflicted with any claimed R.S. 2477 rights-of-way.  SUWA Br. 22–31.

Amici are correct that publishing an interest in the Federal Register is sufficient to give notice to affected parties.  See George, 672 F.3d at 944 (quoting 44 U.S.C. § 1507).  However, as the district court recognized, publication in the Federal Register is sufficient notice to trigger the limitations period only where the published notice conflicts with a plaintiff's interest.  Kane I, 934 F. Supp. 2d at 1362.  Thus, if the published interest does not amount to a claim that a plaintiff

lacks R.S. 2477 rights-of-way within a WSA, the limitations period is not triggered. As San Juan County explained, in the context of R.S. 2477 claims, a published claim by the United States must amount to a claim of "exclusive control" to trigger the QTA limitations period. 754 F.3d at 794. Thus, the determinative issue is whether the Paria-Hackberry designation amounted to a claim of exclusive control or whether it permitted the United States' ownership interest and the Plaintiffs' right-of-way to "peaceably coexist." George, 672 F.3d at 947.

We conclude the Paria-Hackberry designation was insufficient to trigger QTA limitations periods against Kane County and Utah. The fact that the Wilderness Act covers "roadless" areas is inapposite, as the definitions for roads under the Wilderness Act and R.S. 2477 are not the same. Nor is the non-impairment standard by which the BLM was to manage the WSA sufficient to amount to a claim to North Swag road. As a preliminary matter, the Department of the Interior itself did not believe the non-impairment standard served to limit valid existing rights, including rights-of-way. See Solicitor's Opinion M-36910, supra. Even if the non-impairment standard did apply to R.S. 2477 rights-of-way, amici have not shown how this would amount to a claim by the United States of "exclusive control" over North Swag.

Several other BLM memoranda, both contemporaneous with and subsequent to the 1980 wilderness designation, strongly suggest that wilderness designations

do not preclude the recognition of R.S. 2477 rights-of-way. The 1980 Instruction Memorandum issued by the Utah BLM Director, which preceded the Paria-Hackberry wilderness designation, establishes that the BLM did not believe wilderness designations rendered an area "roadless" for R.S. 2477 purposes. The 1990 BLM Memorandum stated with even greater clarity that wilderness designations are "subject to the terms and conditions" of pre-existing rights-of-way. JT App. 2295. Amici cast these BLM documents as an attempt to "unring the bell" that the 1980 Paria-Hackberry designation "chimed," especially given their status as informal agency pronouncements. See SUWA Br. 29; SUWA Reply Br. 16 (citing Spirit Lake Tribe v. North Dakota, 262 F.3d 732, 741–42 (8th Cir. 2001); Kingman Reef Atoll Invs., LLC v. United States, 541 F.3d 1189, 1200 (9th Cir. 2008)). But unlike the cases amici cite, the BLM memoranda are not meant to unring the bell, but to show the bell never rang in the first place. If the BLM did not believe wilderness designations conflicted with rights-of-way within the land, it would be strange indeed to declare that Kane County or Utah should have.

This court's analysis in San Juan County provides further support for our decision. There, San Juan County and Utah brought several QTA claims against the United States, who argued that the § 2409a limitations periods had run. As to the County's claim, the court rejected the United States' contention that the closures of two different segments of the same road amounted to an adverse claim

to the road at issue.  <u>San Juan Cnty.</u>, 754 F.3d at 793–94.  More pertinent here, the court explained that as to Utah's claim, the United States failed to show that either the road closures or "a variety of other park management activities," including "the National Park Service's 1970 recommendation that the upper canyon be designated as wilderness," amounted to notice of a claim *adverse* to Utah's claimed right-of-way.  <u>Id.</u> at 796.  Because these management activities left the road "fully accessible to the public," they did not suffice to trigger the limitations period.[2]  <u>Id.</u>

Similarly here, the BLM took no action to deny the public access to North Swag Road.  <u>See</u> <u>Kane I</u>, 934 F. Supp. 2d at 1362.  Nor have amici established that any of the BLM's management responsibilities pursuant to the wilderness designation were inconsistent with Kane County or Utah's right-of-way on North Swag.

Amici cite three district court opinions for the proposition that the publication of a wilderness designation suffices to trigger the QTA limitations periods.  <u>See</u> SUWA Br. 24 (citing <u>S.W. Four Wheel Drive Assoc. v. Bureau of</u>

---

[2]  We read <u>San Juan County</u> to be in line with our precedent holding that a "range war" or physical actions to "enforce" a claim are unnecessary to trigger the QTA's limitations clock.  <u>George</u>, 672 F.3d at 946.  The <u>San Juan County</u> court ultimately concluded that the QTA was not triggered because Salt Creek Road remained open to the public, but left room for the possibility that "management activities [that] were inconsistent with the claimed right-of-way" could provide the necessary notice to start the limitations period.  754 F.3d at 794.

Land Mgmt., 271 F. Supp. 2d 1308, 1312 (D.N.M. 2003), aff'd on other grounds, 363 F.3d 1069, 1070 (10th Cir. 2004); Bd. of Comm'rs of Catron Cnty. v. United States, 934 F. Supp. 2d 1298, 1306 (D.N.M. 2013); Cnty. of Inoyo v. Dep't of Interior, No. CV F 06–1502 AWI DLB, 2008 WL 4468747 (E.D. Cal. Sept. 29, 2008)). These cases ignore the distinction—acknowledged by the BLM itself—between "roads" for the purpose of the Wilderness Act and "roads" under R.S. 2477. See Bd. of Comm'rs of Catron Cnty., 934 F. Supp. 2d at 1304–07; S.W. Four Wheel Drive, 271 F. Supp. 2d at 1310–12. Moreover, these cases are unpersuasive in light of this court's decision in San Juan County.

Thus, we conclude the designation of the Paria-Hackberry WSA and publication of this designation in the Federal Register were insufficient to trigger the limitations period against Kane County under § 2409a(g) and Utah under § 2409a(i). Because we find Utah was not reasonably aware of an adverse claim by the United States, we need not address whether the United States "conducted substantial activities" or "made substantial improvements" to the land under § 2409a(i).

b.      The 1991 Meeting of the Board of Commissioners

Next, amici contend the County received notice of the United States' adverse claim to North Swag in 1991, when BLM officials met with County officials to inform them of the necessary procedures for obtaining recognition of R.S. 2477 rights-of-way. SUWA Br. 26. This meeting was brought about by the

Secretary of the Interior's December 7, 1988 statement that it was "necessary in the proper management of Federal land to be able to recognize with some certainty the existence, or lack thereof, of public highway grants obtained under R.S. 2477." Kane I, 934 F. Supp. 2d at 1361. Nothing in the minutes of these meetings amounts to an adverse claim by the United States. That some commission members recognized a need to quiet title to R.S. 2477 rights-of-way does not establish that Kane County had reasonable awareness of an adverse claim of the United States. Thus, we affirm the district court's decision finding jurisdiction over North Swag Road under the QTA.

B.      PWR 107 and Lands Reserved for Public Uses Under R.S. 2477

R.S. 2477 rights-of-way can only be established over public lands "not *reserved* for public uses." SUWA, 425 F.3d at 784 (emphasis added). The district court concluded that Public Water Reserve (PWR) 107, a 1926 executive order, operated to "reserve" from the operation of R.S. 2477 two parcels of land across which Swallow Park Road runs. Kane II, 2013 WL 1180764, at *58–59. We disagree.

At the start of the twentieth century, monopolization of public water sources in the West had become a significant problem. See The Classification of the Public Lands, U.S. Geological Survey Bull. 537, at 42–43 (1913). "Water controlled the range," and it became common practice for a landowner to file land scrips upon all water springs in a district, effectively allowing him to exclude all

- 26 -

competition.  See James Muhn, Public Water Reserves: The Metamorphosis of a Public Land Policy, 21 J. Land Resources & Envtl. L. 67, 68, 81 (2001) (citation omitted).  This practice led to regular struggles for possession of watering holes and eventually garnered the attention of Congress and federal land agencies.

In 1910, Congress enacted the Pickett Act (or General Withdrawal Act) granting the President authority to make withdrawals for "water-power sites, irrigation, classification of lands, *or other public purposes*."  Act of June 25, 1910, ch. 421, 36 Stat. 847 (emphasis added).[3]  Pursuant to the "other public purposes" language of the Pickett Act, in 1912 President Taft signed what became Public Water Reserve No. 1, a withdrawal order for 16,200 acres covering roughly 32 watering springs in Western Utah.  Similar withdrawals of federal land containing water came in a somewhat piecemeal fashion.  Opponents of these withdrawals, such as Congressman Frank Mondell of Wyoming, were concerned they might interfere with settlement and acquisition of land in the West. Department of the Interior Secretary Walter Fisher, in defense of the policy,

---

[3]  The Act additionally provided that withdrawn lands "shall at all times be open to exploration, discovery, occupation, and purchase under the mining laws of the United States, so far as the same apply to metalliferous minerals."  37 Stat. 947.  Kane County argues that because R.S. 2477 was enacted as Section 8 of the Mining Act of 1866, which (in other provisions) dealt with metalliferous minerals, R.S. 2477 is a "mining law" that "appl[ies] to metalliferous minerals." Kane Br. 15–16.  We reject this argument and conclude that the mere coincidence of R.S. 2477's location in a law that later came to be known as the Mining Act of 1866 is insufficient to bring it within the Pickett Act's exception.

assured Congressman Mondell that the withdrawals did "not mean that [the water sources] are reserved from private uses; on the contrary, it means that those private uses are encouraged and permitted." Muhn, supra, at 85–86.

In the face of uncertainty regarding the legal authority for such withdrawals, Congress in 1916 passed the Stock-Raising Homestead Act (SRHA), Section 10 of which provides:

> [L]ands containing water holes or other bodies of water needed or used by the public for watering purposes . . . may be reserved under the provisions of the [Pickett Act] and such lands heretofore or hereafter reserved shall, while so reserved, be kept and held open to the public use for such purposes and under such general rules and regulations as the Secretary of the Interior may prescribe. . . .

Act of Dec. 29, 1916, ch. 9, 39 Stat. 862, 865 (codified at 43 U.S.C. §§ 291 et seq.), repealed by FLPMA.

Pursuant to the SRHA and Pickett Act, in 1926 President Calvin Coolidge signed PWR 107, which provides:

> [I]t is hereby ordered that every smallest legal subdivision of the public-land surveys which is vacant unappropriated unreserved public land and contains a spring or water hole, and all land within one quarter of a mile of every spring or water hole located on unsurveyed public land be, and the same is hereby, withdrawn from settlement, location, sale, or entry, and reserved for public use in accordance with the provisions of [the SRHA] and in aid of pending legislation.

Public Water Reserve No. 107 (Apr. 17, 1926). Unlike prior withdrawals of water, PWR 107 was a "blanket" withdrawal. Muhn, supra, at 110.

In sending the order to the President, the Secretary of the Interior

- 28 -

explained:

> The control of water in the semiarid regions of the west means control of the surrounding areas . . . . Private parties have used various lieu selection and scrip acts as a vehicle of acquiring small areas surrounding these springs and water holes, thus withdrawing them from the common use of the general public . . . and for this reason . . . it is believed advisable to make a temporary general order of withdrawal.

Letter from Hubert Work, U.S. Sec'y of the Interior, to President Calvin Coolidge (Apr. 17, 1926).

In 1929, the Secretary of the Interior construed PWR 107 to include, *inter alia*, two parcels of land through which Swallow Park Road crosses. It is undisputed that the Secretary properly determined that PWR 107 applies to these parcels. Thus, the issue before this court is whether the two parcels were "reserved for public use"—thus preventing the operation of R.S. 2477—or merely "withdrawn."

The distinction between a reservation and a withdrawal for purposes of R.S. 2477 was set forth by this court in Southern Utah Wilderness Alliance (SUWA) v. Bureau of Land Management, 425 F.3d 735, 784–86 (10th Cir. 2005). The court in SUWA addressed whether the Coal Withdrawal of 1910, which stated that certain federal lands were "withdrawn from settlement, location, sale or entry, and *reserved* for classification and appraisement with respect to coal values," operated to "reserve" those lands for public use under R.S. 2477. Id. at 784 (emphasis added). The court explained that a withdrawal merely "ma[de] land

- 29 -

unavailable for certain kinds of private appropriation," whereas a reservation "not only withdraws the land from the operation of the public lands laws, but also dedicates the land to a *particular* public use. Id. (emphasis added). Further, "just because a withdrawal uses the term 'reserved' does not mean that it reserves land 'for public uses.'" Id. at 785.

The court found that despite the coal withdrawal's language, it did not reserve the land at issue "for public use." The historical context of the coal withdrawal established that it "narrowly, and temporarily, removed potential coal lands from certain kinds of private appropriation." Id. at 785. The land was withdrawn to allow the United States to "reexamine and reclassify lands which it thought might have exceptional value"—insufficient, in the court's view, to amount to a reservation. Id. (citation omitted). Further, common sense dictated that the withdrawal, which permitted widespread settlement under public law, "was not meant to cut off the right to establish access to those claims." Id. at 786. "[I]t would make little sense for Congress to open public lands to private claims but forbid settlers to construct highways to access those claims." Id.

Whether PWR 107 "reserves" land for "public use" presents a closer question than the coal withdrawal at issue in SUWA. PWR 107 goes beyond the mere temporary appropriation SUWA found the Coal Withdrawal to be. Further, PWR 107 withdrew land to "be kept and held open to the public" for "watering purposes" under the SRHA—certainly more of a "public use" than withdrawing

- 30 -

lands for reclassification and appraisal. However, <u>SUWA</u> explained that a reservation must set aside land for a *specific* public purpose—such as a park, military post, or Native American land—and PWR 107 simply set aside land for the *general* purpose of preserving water access to the public. <u>See</u> <u>id.</u> at 784 (citing 63C Am. Jur. 2d Public Lands § 31 (2005)).

Determinative here is the fact that if PWR 107 did in fact operate to "reserve" land from the operation of R.S. 2477, its effect was the precise opposite of its purpose. PWR 107 sought to prevent private appropriation and monopolization of water sources in order to guarantee public access to these water sources. If PWR 107 "reserved" land from R.S. 2477, the sole means for the public to construct roads to access these water sources would be eliminated. <u>See</u> <u>id.</u> at 786 ("R.S. 2477 was essentially the only authority by which highways could be established across public lands by state and local governments." (quoting BLM in previous litigation)). As in <u>SUWA</u>, it would be nonsensical for Congress and the President to preserve the public's access to watering springs "but forbid settlers to construct highways to access" these springs. <u>Id.</u> at 786. That Congress or the President intended to set aside this land for public watering purposes yet silently deny the public the right-of-way to access it is highly improbable.

The United States suggests that R.S. 2477 rights-of-way are not the only ways for the public to access watering holes reserved under PWR 107 and suggests three alternatives. First, it contends that the 1925 Department of Interior

regulation Circular No. 1028 "fully protected public access to water sources."

Aplee. Br. 56. But Circular No. 1028 merely allowed citizens to apply for a

permit to "improve the productivity of any water hole or source of water supply"

within a reserve or "conduct such waters from their source within a reserve to a

point or place more convenient for public use"; the regulation does not provide

for general public access to use the sources. See Supp. App. 103. Next, the

United States points to federal regulations setting forth procedures for obtaining a

right-of-way across reserved lands. Aplee. Br. 57 (citing 43 C.F.R. § 244.47

(1943)). But these regulations did not come about until 1943, seventeen years

after PWR 107. Finally, the United States argues that, as the district court

observed, Plaintiffs could simply request a right-of-way pursuant to the FLPMA

Title V permit process. Aplee Br. 58 n.27. Perhaps so, but this argument suffers

the same flaw as the prior one: the Title V permit process did not become

available until the passage of the FLPMA in 1976. See Pub. L. No. 94-579, Title

V, § 501, 90 Stat. 2776 (Oct. 21, 1976) (codified at 43 U.S.C. § 1761). The

logical consequence of this argument is that PWR 107, an executive order aimed

at ensuring public access to water, had precisely the opposite effect until the

passage of the FLPMA in 1976. This argument is untenable.

In SUWA, the court found that common sense dictated that a coal

withdrawal that permitted widespread settlement under homestead laws "was not

meant to cut off the right to establish access to those claims." 425 F.3d at 786.

The same rationale applies here. R.S. 2477 was "essentially the only authority" by which the public could establish roads across federal lands. Id. If PWR 107 cut off that authority, no roads could be developed to access the very water PWR 107 aimed to preserve for public use.

For the foregoing reasons, we conclude PWR 107 was not a "reservation" for the purposes of R.S. 2477 and thus reverse the district court's determination that Plaintiffs could not establish a right-of-way on the segment of Swallow Park Road crossing these parcels. On the remainder of Swallow Park Road, the district court found Plaintiffs presented sufficient evidence to establish an R.S. 2477 right-of-way. Kane II, 2013 WL 1180764, at *52. Because the district court found that "no evidence was presented that the public has been denied access to [the] portions of the road crossing . . . the PWR 107 parcels" and that "the public was able to travel the full length of [Swallow Park Road] as often as it found it convenient or necessary," Kane County and Utah have also established an R.S. 2477 right-of-way over the portion of Swallow Park Road that crosses the PWR 107 parcels as well. Id.

C.    Standard of Proof

The district court required Plaintiffs to prove their R.S. 2477 rights-of-way by clear and convincing evidence and found that Plaintiffs had not met this burden as to three of the Cave Lakes roads, K1075, K1087 and K1088. Kane II, 2013 WL 1180764, at *43–45, *55. Kane County and Utah appeal as to K1075

and contend that "preponderance of the evidence" is the appropriate standard of proof for establishing R.S. 2477 rights-of-way. Because we concluded above that the district court erred in exercising jurisdiction over Cave Lakes Road K1075, we do not reach the issue of the appropriate standard of proof.

D.     Scope of the Rights-of-Way: North Swag, Swallow Park, and Skutumpah Roads

Swallow Park Road is a narrow, five-mile stretch of dirt road in Western Kane County. A four-mile stretch of the road has a 10–12 foot travel surface with vehicles unable to pass. Similarly, North Swag Road is a narrow dirt road approximately five miles long with a travel surface of ten feet. Skutumpah Road is a major two-lane thoroughfare with a travel surface of 24–28 feet.

The district court found Plaintiffs had established R.S. 2477 rights-of-way on North Swag, Swallow Park, and Skutumpah roads. Kane II, 2013 WL 1180764, at *51–53, *60–62. It determined Plaintiffs held 24-foot rights-of-way on Swallow Park and North Swag Road and a 66-foot right-of-way on Skutumpah Road. The United States contends that the district court committed two errors. First, the United States argues the court failed to base the North Swag and Swallow Park right-of-way widths on uses that were established as of 1976, when R.S. 2477 was repealed.[4] Aplee. Br. 38–44. Second, it contends the district court

---

[4] The United States does not challenge the district court's width determination as to the wider portion of Swallow Park Road that is below its intersection with Skutumpah. Aplee. Br. 36 n.17.

improperly allowed room for unspecified future improvements to North Swag, Swallow Park and Skutumpah roads.  Id. at 45–50.  We agree with the United States on both points and remand to the district court.

1.    "Reasonable and Necessary" in Light of Pre-1976 Uses

The FLPMA repealed R.S. 2477 in 1976 but preserved existing rights-of-way.  See 43 U.S.C. § 1769(a).  Thus, R.S. 2477 rights-of-way were preserved "as they existed on the date of passage" of the FLPMA, October 21, 1976.  Hodel, 848 F.2d at 1083; see also SUWA, 425 F.3d at 746 ("[T]he scope of an R.S. 2477 right of way is limited by the established usage of the route as of the date of the repeal of the statute.").

The width of the road, however, is not limited to the actual beaten path as of October 21, 1976.  Hodel, 848 F.2d at 1083; SUWA, 425 F.3d at 746.  Courts look to state law to determine the appropriate width, Hodel, 848 F.2d at 1083, and under Utah law, the width of a public road is that which is "reasonable and necessary under all the facts and circumstances."  Memmott v. Anderson, 642 P.2d 750, 754 (Utah 1982).  Thus, the road can be "widened to meet the exigencies of increased travel," including where necessary to ensure safety. Hodel, 848 F.2d at 1083–84 (citation omitted).  However, the "'reasonable and necessary' standard *must be read in the light of traditional uses to which the right-of-way was put*."  Id. at 1083 (emphasis added).  Thus, the proper inquiry is what width is reasonable and necessary in light of the pre-1976 uses of the road.

Id. at 1084 (holding that improvement of the Burr Trail was "reasonable and necessary to ensure safe travel" in light of the pre-1976 uses of livestock transportation, oil, water and mineral development and tourism).

The district court made only a passing reference to Hodel and SUWA's mandate that the reasonable and necessary standard be viewed in light of pre-1976 uses and did not appear to apply this standard to Swallow Park and North Swag roads. Kane II, 2013 WL 1180764, at *63–65. It made substantial factual findings regarding pre-1976 uses of Swallow Park and North Swag and considered these findings in evaluating whether R.S. 2477 rights-of-way existed at all. See id. at *51–52 (Swallow Park), *52–53 (North Swag). However, it did not consider these findings in evaluating their scope. Id. at *65. Instead, the court relied chiefly on travel guidelines published by the American Association of State Highway and Transportation Officials (AASHTO) suggesting road widths for roads providing access to recreational or agricultural areas. These Guidelines may be relevant to the determination of what width is reasonable and necessary in light of the pre-1976 uses of Swallow Park and North Swag roads. However, because the district court did not discuss these pre-1976 uses, we must remand.

The FLPMA "had the effect of 'freezing' R.S. 2477 rights as they were in 1976." SUWA, 425 F.3d at 741. It brought about a "statutory sea change" that "instituted a preference for retention of the lands in federal ownership, with an increased emphasis on conservation and preservation." Id. These policies inform

our determination of the scope of R.S. 2477 rights-of-way and call for caution in allowing improvements or expansions beyond the width of R.S. 2477 roads in 1976. As this court has consistently held, rights-of-way may be expanded beyond their 1976 widths only where reasonable and *necessary* in light of pre-1976 uses.

2.     Unspecified Future Improvements

The district court determined that a 60-foot right-of-way was appropriate for Skutumpah Road and explained that this width would allow "room to address any future realignments or other improvements needed to increase safety." Kane II, 2013 WL 1180764, at *64. As to Swallow Park and North Swag roads, the court determined 24-foot rights-of-way were appropriate, explaining that this width "allow[ed] for maintenance and improvements." Id. at *65. The United States contends that the district court erred in allowing room for unspecified future improvements. We agree.

Hodel explained that "the initial determination of whether activity falls within an established right-of-way is to be made by the BLM and not the court." 848 F.2d at 1084 (citation omitted). SUWA clarified this statement by drawing a sharp distinction between "routine maintenance" and "improvements" to R.S. 2477 rights-of-way. 425 F.3d at 749. When a right-of-way holder undertakes routine maintenance, it need not consult with the pertinent federal land management agency. But, before a holder makes "improvements" to a right-of-way, the land management agency must be consulted to allow it an opportunity to

determine if the improvement is "reasonable and necessary" and to "study potential effects, and if appropriate, to formulate alternatives that serve to protect the lands." Id. at 748. Only in the event of a disagreement at this stage can the parties resort to the courts. Id.

Plaintiffs argue that the United States' right under SUWA to be consulted prior to improvements on the right-of-way was not violated because the district court explained that "realignments or improvements would require consultation with the BLM before they are undertaken." Kane II, 2013 WL 1180764, at *64 n.33. But this places the cart before the horse. A court can find, as did the court in Hodel, that certain proposals for improvement are "reasonable and necessary" in light of the traditional uses of the road, so long as the BLM was consulted in advance. 848 F.2d at 1084. But to allow for unspecified improvements ex ante deprives the BLM of the opportunity to perform its duties effectively. The process set forth in SUWA contemplates a precise order of actions for holders of rights-of-way seeking improvements. First, they consult with the BLM as to the proposed improvements; then, "[i]n the event of a disagreement, the parties may resort to the courts." 425 F.3d at 748. Thus, we find the district court erred in allowing for unspecified improvements in setting the widths of the rights-of-way on Skutumpah, Swallow Park and North Swag roads. Therefore, we remand the question of the scope of the R.S. 2477 rights-of-way on these roads.

AFFIRMED in part, REVERSED in part, and REMANDED.[5]



[5] We grant the motion of Sierra Club, Grand Canyon Trust and National Parks Conservation Association for leave to file an amicus brief.